Stephanie J. Quincy, SBN 014009
quincys@gtlaw.com
Aaron J. Lockwood, SBN 025599
lockwooda@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
(602) 445-8000

*Attorneys for Respondent Bruce Allen*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from Bruce Allen Pursuant to 28 U.S.C. § 1782 | Case No. 2:21-mc-00022-SPL<br><br>**RESPONDENT BRUCE ALLEN'S ANSWER TO PETITION AND MOTION TO VACATE APRIL 29, 2021 EX PARTE ORDER AND QUASH SUBPOENAS OR, ALTERNATIVELY, FOR PROTECTIVE ORDER**<br><br>**(Oral Argument Requested)**<br><br>*Proposed form of Order lodged concurrently herewith* |

Respondent Allen hereby answers the *Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. §1782 ("Petition") filed by Petitioner Snyder, and, pursuant to 28 U.S.C. §§1782 and 1927, Federal Rules of Civil Procedure 26(c) and 45(d), the Court's inherent authority, and other appliable law, moves for an Order:

1. vacating the April 29, 2021 *Ex Parte* Order granting the Petition;
2. quashing in their entirety the two Subpoenas served on Respondent pursuant to the *Ex Parte* Order; and
3. awarding Mr. Allen his reasonable attorneys' fees and costs.

Alternatively, Respondent moves for an Order modifying the Subpoenas, barring inquiry into all or certain matters, and limiting the use of responsive information, if any, to use in the foreign proceeding to protect Mr. Allen from harassment, annoyance, oppression, invasion of privacy, and undue burden or expense.

Mr. Allen unequivocally denies any connection whatsoever to the articles linking Mr. Snyder to Jeffrey Epstein and sex trafficking that gave rise to the foreign action underlying this proceeding. (Ex. A, Declaration of Bruce Allen ("Allen Decl.") ¶ 15.) Mr. Allen has never contacted, or been contacted by, anyone from India or anyone connected to any Indian internet or media entity or publication, whether via phone, text, email, or otherwise. (*Id.* ¶ 12.)

Pursuant to LRCiv 7.2(j), Respondent's counsel wrote to Mr. Snyder's counsel on May 10, 2021 to confer regarding the propriety and scope of the Petition and Subpoenas. Mr. Snyder's counsel responded by letter on May 12, stating that Mr. Snyder would not withdraw the Petition. Critically, the only evidence Mr. Snyder provided in support of his Petition was: (a) Mr. Allen's text messages expressing shock and disbelief *in response to* the Indian articles at issue; and (b) two of Mr. Allen's email merely forwarding other articles about Petitioner—again well *after* the articles at issue. (*See* Allen Decl., Ex. 4; Ex. B hereto.) Nevertheless, the parties are scheduled to confer on Monday, May 17.

The following Memorandum of Points and Authorities and its exhibits, including the Allen Declaration and its exhibits, support this Motion.

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Mr. Snyder initiated this action purporting to discover evidence for use in a defamation lawsuit he filed in India in August 2020 (the "Indian Action"). Though he alleges "a series of false and defamatory 'news' articles" (Petition at 2), in truth, Mr. Snyder identifies only two on which the Indian Action is based:

- "Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list'"; and

- "#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out.'"

(Petition at 5-6; collectively, the "Epstein Articles.")

With only the charging document in the Indian Action as his factual support, Mr. Snyder filed unverified Petitions against Mr. Allen first in the U.S. District Court in Los Angeles, and then with this Court, requesting permission for sweeping discovery from Mr. Allen. Mr. Snyder provided no advance notice to Mr. Allen of either proceeding, prompting this Court to enter its *Ex Parte* Order authorizing the issuance of two subpoenas entirely in reliance on Mr. Snyder's misleading allegations. Perhaps more serious is Mr. Snyder's omission of material information that bears directly on the propriety of his request of this Court. §1782 requires a credible showing that the discovery sought is legitimately pertinent to the Indian Action. Yet, when viewed in its true context, the Petition here offers no more than rank and, in fact, false speculation about Mr. Allen as pretext to gain access to his personal email, text messages, and phone calls. Put bluntly, Mr. Snyder seeks Mr. Allen's personal information for unstated purposes here in the United States, not "for use" by the tribunal in New Delhi.

Indeed, the Petition omits any reference to most of the at least twelve §1782 proceedings that Mr. Snyder has filed in courts nationwide, *starting the same day he commenced the Indian Action*. (Ex. C, Summary of Petitioner's Known §1782 Petitions.) Mr. Snyder's attorney, Joseph Tacopina, admitted publicly that these proceedings lack

the ultimate goal of prosecuting the Indian Action, but are instead designed to gather facts for potential, domestic litigation:

> JP FINLAY: What's your goal with this thing? **The goal is not to prosecute in India, right?** I imagine you want everything to happen here in the old US of A?
>
> JOE TACOPINA: We are – we did sue that company in India. That's for sure. ***But, yes***, here's our goal …. The goal is to ensure that the full weight of the law comes down heavily on those responsible ….

(Ex. D, Tr. 13:1-11 (partial transcript, 8/14/20 J. Tacopina interview) (emphasis added).)

To that end, Mr. Snyder asserted one of his first petitions against Mary Ellen Blair and the Comstock Holding Companies (which Mr. Snyder alleged to be Ms. Blair's landlord).[1] Mr. Tacopina, who filed that petition, described the basis for it as follows:

> Obviously, *we've done an investigation* and I have my own beliefs and my own opinions, but before I opine, I want to have *rock solid evidence*.… [T]his one individual – this form[er] disgruntled employee [of the Washington Football Team (the "Team")] – has spoken to various witnesses – various individuals in attempts to get them to provide false information about Dan Snyder…. ***We have sworn affidavits to back that up, and we have audio tape recordings to back that up. So, you know, we wouldn't be making these filings if we weren't rock solid in our proof***.

(Ex. D, Tr. 7:2-19 (emphasis added).) Mr. Snyder has presented no such "rock solid evidence" or "proof," whether obtained through a pre-petition "investigation" or from another §1782 proceeding, that implicates Mr. Allen in the Epstein Articles in any way. Although this appears to be Mr. Snyder's thirteenth §1782 petition, he has nothing more than conjecture to justify a pervasive intrusion into Mr. Allen's personal life.

In another of Mr. Snyder's early §1782 proceedings, he targeted John Moag, an investment banker for three individuals who, until recently, were the Team's minority

---

[1] The response to the §1782 petition against Comstock Holding Companies, Inc. details voluminous evidence of Mr. Snyder's bad faith in that action, including hiring Comstock's "long time counsel" Reed Smith (counsel in this matter) to file the action and luring away a director who, just five days before the §1782 action was filed, went to work for Mr. Snyder. Reed Smith subsequently withdrew as counsel in that action. (Ex. E, Response at 2, 6.)

3

owners. Mr. Snyder's unsupported conjecture is that these former minority owners have said negative things about him as part of an alleged conspiracy to defame him. (Ex. F, Order at 4-5.) (Mr. Snyder has not initiated any proceedings against the minority owners.) Because Mr. Moag represents the former minority owners, Mr. Snyder concludes that Mr. Moag must be involved in that "campaign." No evidence exists to support this conclusion. Then, in that §1782 proceeding against Mr. Moag, Mr. Snyder obtained phone records confirming communications in 2020 between Mr. Moag and Mr. Allen.[2]

With no more than rank speculation as to the content of those communications and unsubstantiated allegations that Mr. Moag spoke with reporters from *The Washington Post*, Mr. Snyder now concludes that Mr. Allen also must somehow be involved in this "campaign of defamation." Mr. Snyder attempts to support this ridiculous conclusion by observing that Mr. Allen and Mr. Moag spoke frequently in 2020, around the same time as damning articles were published about Mr. Snyder, including by *The Washington Post*. But, again, none of these alleged dots actually connect to each other, much less connect Mr. Allen to the Epstein Articles.

At bottom, under both §1782 and the Federal Rules of Civil Procedure, third-party discovery must have a good-faith predicate to justify the burden and invasion of privacy to be imposed, which is totally missing here. No plausible relationship between Mr. Allen and the Epstein Articles is alleged because there is none (or between Mr. Moag, or even Ms. Blair, and the Epstein Articles). Nor does Mr. Snyder offer any reason to believe that Mr. Allen has documents or information that would speak to the merits of Mr. Snyder's defamation claims in the Indian Action—again, because none exist.

But, even if Mr. Snyder otherwise met §1782's requirements for discovery, his requests here are grossly overbroad, and fail to focus on evidence remotely relevant to the

---

[2] In fact, Mr. Moag has been a personal friend of Mr. Allen for about twenty-five years and for a decade before Mr. Allen served as the Team's General Manager. (Allen Decl. ¶ 24.) Mr. Moag and Mr. Allen regularly communicated not only in 2020, but also 2019, 2018, 2017, and for well over a decade before that, as individuals who share a common interest in the business of football. (*Id.* ¶ 25.)

4

Indian Action. Football has been Mr. Allen's professional life for decades. He held an executive position with the Team for over ten years, with Mr. Snyder as the controlling owner. Instead of limiting the requests to the Epstein Articles, however, which is the sole justification for §1782 discovery, the Subpoenas essentially ask for everything concerning Mr. Snyder or the Team, implicating literally thousands of documents. The sheer overbreadth of these requests warrants a protective order narrowing their scope. Moreover, the requests target Mr. Allen's personal email, texts, and phone records with family members, counsel, and friends. To the extent otherwise warranted, the use of any responsive, non-public information therefore should be limited to the Indian Action.

## PERTINENT BACKGROUND

### A. During his time with the Team, and since, Mr. Allen has avoided publicity and involvement with the media.

Mr. Allen is a highly respected and experienced football executive. (Allen Decl. ¶ 3.) After working with the Oakland Raiders from 1995-2003, he worked with the Tampa Bay Buccaneers from 2004 to 2008. (*Id*. ¶ 4.) In mid-December 2009, he assumed the role of the Team's Executive Vice-President (later becoming President) and General Manager, which he held until after the 2019-2020 season, during which he represented the Team in NFL affairs, brokered training-camp deals, negotiated player contracts, and labored to get the Team a new stadium, among other tasks. (*Id*. ¶ 5-6.) Despite this high-profile role, Mr. Allen has maintained a low media profile, rarely participating in press conferences, rarely speaking with reporters, and *never* serving as an anonymous source for news articles. (*Id*. ¶¶ 7, 9.) He also has no account with Facebook, LinkedIn, or Twitter. (*Id*. ¶ 8.)

Since his departure from the Team, Mr. Allen has not spoken to reporters or responded to any media inquiries, including about the Epstein Articles. (*Id*. ¶ 10.) He has had no communications whatsoever with defendants in the Indian Action or anyone connected to them. (*Id*. ¶ 11.) He has never so much as speculated about Mr. Snyder having a link to Jeffrey Epstein or being involved in sex trafficking, nor is he aware of anyone else who has ever engaged in such speculation, except as reflected in the Epstein Articles. (*Id*. ¶ 14.)

After terminating Mr. Allen's position with the Team, Mr. Snyder forced him to initiate legal proceedings to obtain the last of his contractually protected compensation. (*Id.* ¶ 16.) Specifically, on April 1, 2020, Mr. Snyder attempted to use the coronavirus pandemic as an opportunity to reduce the amount still owed to Mr. Allen. (*Id.*, ¶¶ 17-18, Ex. 2.) This forced Mr. Allen to retain legal counsel and initiate a proceeding through the NFL to obtain his compensation, which he did. (*Id.* ¶ 19.) Notably, Mr. Snyder's discovery now directed to Mr. Allen seeking anything related to "Mr. Snyder" or "the Team" implicates, as Mr. Snyder knows, this prior legal dispute and Mr. Allen's privileged communications in connection with it. (*Id.* ¶ 20.)

### B. Beginning in mid-2020, The Washington Post *published multiple stories casting Mr. Snyder in an unfavorable light.*

On July 16, 2020, *The Washington Post* reported, "From Dream Job to Nightmare," that more than a dozen women had alleged sexual harassment and verbal abuse by former Team employees.[3] In late August 2020, the *Post* published a follow-up article with allegations by more women some directed at Mr. Snyder personally.[4] Then, on December 22, 2020, the *Post* reported that, in 2009, a sexual-misconduct claim against Mr. Snyder was settled for $1.6 million.[5] The impact of these articles was embarrassing for Mr. Snyder, and, in response, he seems to have focused not only on probing the sources of the *Post*'s articles, but also on publicly casting himself as a victim of false press. None of these articles, however, are the subject of Mr. Snyder's legal actions.

### C. In mid-2020, Mr. Snyder initiated his nationwide § 1782 campaign.

On July 16, 2020, the MEAWW posted online the Epstein Articles. (Petition at 5.) These articles speculated that the to-be-published *Post* story might include allegations

---

[3] https://www.washingtonpost.com/sports/2020/07/16/redskins-sexual-harassment-larry-michael-alex-santos/
[4] https://www.washingtonpost.com/sports/2020/08/26/redskins-cheerleaders-video-daniel-snyder-washington/?arc404=true&itid=lk_inline_manual_4
[5] https://www.washingtonpost.com/sports/daniel-snyder-sexual-misconduct-settlement/2020/12/22/f81131d8-4339-11eb-a277-49a6d1f9dff1_story.html

6

connecting Mr. Snyder to Mr. Epstein. The *Post* articles in fact contained no such allegation. (*Id.*) In response to these Articles, Mr. Snyder commenced the Indian Action on August 7, 2020. (*Id*. at 1.) That same day, he filed his first §1782 petition against New Content Media, Inc., a purported domestic owner or operator of the MEAWW website. (Ex. C.) On August 10, he filed another §1782 petition against Ms. Blair, a former administrative assistant for the Team who Mr. Snyder claimed to be a source for the Epstein Articles. (*Id.*) Shortly thereafter, one of Mr. Snyder's attorneys claimed to have sworn affidavits and recordings to support these allegations. (Ex. D, Tr. 7:5-19.)

Since then, Mr. Snyder has served about a dozen other §1782 petitions, leveraging the power of the federal courts, and Mr. Snyder's considerable wealth, against individuals and entities nationwide. Again, when one of Mr. Snyder's attorneys was asked whether his goal was "not to prosecute in India," but here in the United States, the response was that, "we did sue that company in India. That's for sure. **But, yes**, here's our goal … to ensure that the full weight of the law comes down heavily on those responsible." (*Id*. at 13:1-12 (emphasis added).) Despite the discovery Mr. Snyder has obtained from these §1782 proceedings, he has yet to file a single, U.S.-based defamation lawsuit related to the Indian Action, or even to the many *Washington Post, New York Times*, and other damning articles published about him.

### D. In late 2020, Mr. Snyder requested documents from Mr. Allen in his ongoing dispute with the Team's minority owners.

In 1999, Mr. Snyder purchased the Team and its stadium. A few years later, he sold minority interests to Dwight Schar, Robert Rothman, and Frederick Smith. Mr. Snyder's relationship with the minority owners deteriorated over the years, and, on July 5, 2020, *The Washington Post* reported that the minority owners wanted to sell their interests, in large part because they were "not happy being a partner" with Mr. Snyder.[6] As one court in another of Mr. Snyder's §1782 proceedings observed with skepticism, Mr. Snyder even accused one or

---

[6] https://www.washingtonpost.com/sports/2020/07/05/redskins-minority-owners-look-sell-stakes-team-amid-ongoing-turmoil/

7

more of the Team's minority owners of being involved with the creation of the Epstein Articles giving rise to the Indian Action (Ex. F, Order at 5):

> It appears that Mr. Snyder's theory is that someone affiliated with a minority owner is somehow working with Ms. Blair to plant defamatory and embarrassing articles (such as ones false associating Mr. Snyder with sex trafficker Jeffrey Epstein) in order to put pressure on Mr. Snyder to sell his shares in the Team.

In late 2020, Mr. Snyder attempted to draw Mr. Allen into an arbitration under the NFL bylaws with the minority owners by serving him with broad, third-party discovery. (Allen Decl. ¶ 21.) Those requests sought documents similar to what is at issue here, including documents related Mr. Snyder or the Team and communications with Mr. Moag or Ms. Blair. (*Id.* ¶ 22, Ex. 3.) Mr. Allen never responded, and Mr. Snyder abandoned them. (*Id.* ¶ 23.)

### E. Mr. Snyder now purports to seek similar discovery based on speculation of an indirect connection to *The Washington Post.*

Mr. Snyder asserts two factual bases for now purporting to believe that Mr. Allen has discoverable information in aid of the Indian Action. First, Mr. Snyder speculates about the content of Mr. Allen's conversations with his longtime friend, Mr. Moag. Specifically, Mr. Snyder alleges that his §1782 discovery from Mr. Moag reveals numerous phone calls in 2020 with Mr. Allen, during a timeframe that Mr. Moag "spoke with members of the press, most notably *The Washington Post*…." (Petition at 2.) From this, Mr. Snyder speculates that, because Mr. Allen "no longer held a position with the Team as of 2019, [he] had no valid business reason for speaking with Mr. Moag during that time period." (Petition at 8.) Mr. Snyder offers no credible basis for this conjecture, and Mr. Snyder does not allege any communication between with anyone associated with the Epstein Articles and Mr. Moag—much less Mr. Allen. (*Cf. id.* at 2-3.)

Mr. Snyder further argues that, because Mr. Allen has never been accused of workplace harassment and sexual misconduct, he must be a source of relevant information:

8

> [D]espite [Mr. Allen's] prominent position and hands-on role in running the Team during the time period discussed in many of these negative articles [*i.e.*, *The Washington Post* articles], Respondent's name rarely, if ever, was mentioned in these articles – and was completely absent from the Defamatory Articles at issues in the Indian Action.

(Petition at 3.) Mr. Snyder's speculation, however, is logically and factually unfounded. It is far more likely—and, in fact, the truth—that *The Post* articles did not mention Mr. Allen because he never engaged in any such wrongdoing. *Mr. Allen was not even with the Team at the time these events happened (nor was he on the airplane where the alleged sexual assault happened). He was not with the Team when the matter was settled*.

Nevertheless, Mr. Snyder professes to seek discovery concerning: (1) Mr. Allen's communications with third parties concerning Mr. Snyder and the MEAWW articles; (2) Mr. Allen's communications with the Indian defendants or their representatives; (3) the identities of any other third parties involved in directing, coordinating with or supporting any negative information campaign about Mr. Snyder; and (4) other documents and information relevant to the Indian Action and allegedly available solely through Mr. Allen. (Petition at 9.) Mr. Snyder's stated purpose is "to further establish the liability of defendants in the Indian Action, by elucidating their bad faith and active participation in a broader scheme to defame Petitioner." (*Id*. at 10-11.)

But Mr. Snyder's requests are much broader. By his Subpoenas, he demands, from January 1, 2020 to the present: "All Documents and Communications concerning": (1) "Mr. Snyder"; (2) "the Team"; (3) "MEAWW, Eleven and/or any affiliates, agents or employees thereof"; (4) "the Defamatory Articles and/or any actual or anticipated negative publicity concerning Mr. Snyder"; and (5) communications "between [Mr. Allen] and any third party – including, but not limited to, Mr. John Moag, Ms. Mary Ellen Blair and/or Mr. Bobby Potter – concerning Mr. Snyder, the Defamatory Articles and/or any actual or anticipated negative publicity concerning Mr. Snyder …." (Petition, Ex. A at 11.) Mr. Snyder also seeks to depose Mr. Allen on seven broad topics overlapping substantially with these document requests. (Petition, Ex. B at 6-7.)

9

## ARGUMENT

**I.  Given the Petition's unsupported, speculative, and pretextual nature, the *Ex Parte* Order should be vacated and Petitioner's Subpoenas quashed.**

As the Court's *Ex Parte* Order explains, granting a §1782 petition involves a two-step inquiry: first, the application must meet the statutory requirements of § 1782; second, even if the statutory requirements are satisfied, several discretionary factors bear on whether relief should be granted. (Doc. 4 at 2, citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004).) This Court further explained that "[a] district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." (*Id.*) Indeed,

> if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation.

*United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir. 2001). Similarly, the Federal Rules provide that a court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including "forbidding the disclosure or discovery." Fed. R. Civ. P. 26(c)(1).

Mr. Snyder here unreasonably seeks personal, private, and cumulative or irrelevant material in a manner that is, at best, harassing and, at worst, in bad faith because, among other reasons: (a) he already has the information he purports to need; (b) he can only speculate that Mr. Allen has information even potentially relevant to the Indian Action; (c) his Petition appears to be mere pretext to fulfill his improper interest about who is saying what about him; and (d) his requests on their face go far beyond anything remotely related to the Indian Action.

**A.  Mr. Snyder already has or will obtain from defendants in the Indian Action the information he purports to seek.**

As a threshold matter, Mr. Snyder argues that "[t]he discovery sought would relate to *the lack of truth* in the Defamatory Articles and shed light on *the authors'*

10

*motivations* in posting the Defamatory Articles, goals which are directly relevant to the Indian Action." (Petition at 12 (emphasis added).) This point comports with Mr. Snyder's charging document in the Indian Action as to applicable Indian law:

> This Hon'ble Court, in a catena of judgements has held that speech that the Press enjoys can be curtailed with reasonable restrictions in instances where they are not entitled to either make or circulate defamatory statement, false statements made with the intention to deteriorate the image of a public figure, etc. The Defendant Nos. 5 & 6 who are the original authors of the impugned articles/posts uploaded on the Defendant No. 2 website have failed to exercise caution, have failed to verify and/or ascertain the truthfulness and correctness behind the said allegations, and have proceeded with publishing the impugned articles, with malicious intent so as to damage the Plaintiff's reputation and goodwill, and are thus liable to be proceeded against in accordance with law.

(Petition, Ex. C at 20.) From this, discovery as to falsity and the authors' intent would aid the foreign tribunal in the Indian Action.

The Subpoenas served on Mr. Allen, however, further neither of those goals. First, Mr. Snyder's Petition admits that the MEAWW website has removed the Epstein Articles in response to the Indian Action. (Petition at 6.) One Snyder attorney also reported that the defendants in the Indian Action already have admitted "errors in reporting." (Ex. D, Tr. 12:16-19.) And, neither *The Washington Post* nor any other major media outlet reported that Mr. Snyder was linked in nefarious ways to Mr. Epstein or sex trafficking.

Second, authors of the Epstein Articles are already defendants and subject to discovery in the Indian Action. (Petition at 2.) Mr. Snyder's charging document in the Indian Action also already requests "an order directing the Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information qua the said impugned articles…." (Petition at 33-34.)

Moreover, one of Mr. Snyder's attorneys already has publicly claimed that Mr. Snyder's legal team was "rock solid in our proof" that Ms. Blair (who apparently has yet to be deposed, much less sued for defamation) served as a source for MEAWW. (Ex. D, Tr. 7:9-19.) It is therefore unsurprising that Mr. Snyder's Petition fails to offer

11

any reason why he needs discovery *from Mr. Allen* to obtain evidence regarding the truth or motivation behind the Epstein Articles. It is because he does not.

### B. Mr. Snyder provides no factual link between Mr. Allen and the Epstein Articles that might support this intrusion into Mr. Allen's personal life.

"An application for Section 1782 relief must have a good faith predicate." *Green Dev. Corp. v. Zamora*, No. 15-21594-MC-GOODMAN, at *6 (S.D. Fla. May 10, 2016). But Mr. Snyder's Petition is not based on any logical linking of Mr. Allen to the Epstein Articles. Rather, the Petition speculates that Mr. Allen has an indirect connection, via Mr. Moag, to *The Washington Post*. (Petition at 2-3.) The best Mr. Snyder offers is that, because Mr. Allen "no longer held a position with the Team as of 2019, [Mr. Allen] had no valid business reason for speaking with Mr. Moag during that time period," and that, "during 2020, Mr. Allen emailed and texted website links and excerpts of negative news coverage concerning [Mr. Snyder] to Mr. Moag." (Petition at 8.) These assertions are illogical, to the point of not being credible, and in any event provide far too slender a reed to justify this unnecessarily invasive intrusion into Mr. Allen's personal life.

The more than 20-year personal friendship between Mr. Allen and Mr. Moag includes innumerable connections to the Team and professional football, and sports in general. Rather establishing Mr. Allen as complicit in some far-reaching, "campaign of defamation" against Mr. Snyder, a far more rational and truthful explanation for their frequent communications is their friendship, and, in 2020, in reaction to the nationally publicized *Washington Post* and other articles and reports about the Team.[7]

Magistrate Judge Neureiter of the U.S. District Court for the District of Colorado reached precisely this conclusion in rejecting Mr. Snyder's attempt to obtain sweeping discovery of the personal communications between Jessica McCloughan, the wife of the

---

[7] Mr. Snyder's Petitions emphasizes that all but one of these calls in 2020 between Mr. Allen and Mr. Moag occurred in April or later. (Petition at 2.) Far from being "astonishing," this increase in Mr. Allen's phone usage at that time reflects the fact that he, like many in the United States, found himself quarantined at home in response to the coronavirus pandemic. (Allen Decl. ¶ 32.)

12

former Team General Manager, and Ms. Blair, "the former executive assistant to Mr. Snyder, who left her employment on bad terms." (Ex. F, Order at 2.) In that proceeding, like here, Mr. Snyder "hypothesize[d] that because Mrs. McCloughan … talked on a number of occasions to Ms. Blair around the time of the Indian articles, and also talked to a reporter for The Washington Post, then she could be part of (or have information about) the alleged conspiracy to defame Mr. Snyder by planting fake sex trafficking stories on the Indian website." (*Id*. at 9-10.) Judge Neureiter concluded, however, that "[t]he link between Mrs. McCloughan and the defamatory Indian publications is tenuous at best," and that Mr. Snyder's "efforts to obtain extensive cell phone records and texts messages from Mrs. McCloughan **appears to a fishing expedition**, without significant factual justification." (*Id*., Order at 9 (emphasis added).) Judge Neureiter reasoned that:

> whether Mrs. McCloughan or Ms. Blair were sources for The Washington Post is completely irrelevant to the issue of the defamatory Indian articles. The Washington Post article is not the subject of any litigation. Efforts to learn whether Mrs. McCloughan communicated with The Washington Post are improper, unnecessarily invasive, and being done for what the Court perceives is an improper purpose … rather than the proper purpose of discovering evidence about the defamatory Indian website publications.

(*Id*., Order at 3.)

Mr. Snyder here seeks to rely on the same speculative correlation between the mere timing of alleged communications and the publication of negative stories about him, and this Court should similarly reject it as tenuous and without factual justification. *See, e.g.*, *In re O2CNI Co.*, No. C 13-80125 CRB (LB), at *20 (N.D. Cal. Oct. 29, 2013) (explaining why "whether the section 1782 request is a fishing expedition or a vehicle for harassment" is a proper question for courts to ask).

### C. Mr. Snyder's § 1782 Petition is mere pretext to scour Mr. Allen's records for information for his general use in the United States.

Numerous telltale facts confirm that Mr. Snyder's §1782 Petition is not intended to discover evidence "for use in" the Indian Action. First, as discussed above, Mr. Allen

13

is not needed to prove the key legal issues in the Indian Action—falsity and the authors' intent. Nor does any credible reason exist to believe that Mr. Allen has evidence related to such issues. Second, as also discussed above, Mr. Snyder offers no logical connection between Mr. Allen and the Epstein Articles—at most he speculates about a link, via Mr. Moag, between Mr. Allen and *The Washington Post*.

Third, the Petition reaches far beyond the Epstein Articles, referring vaguely to a broad "campaign of defamation" or "corrupt misinformation campaign" against Mr. Snyder. (Petition at 3, 7.) The Petition then falsely speculates that, again through communications with Mr. Moag, Mr. Allen has "relevant information concerning the same campaign of defamation." (*Cf.* Petition at 3 *with* Allen Decl. ¶¶ 12-15.)

Fourth, documents Mr. Snyder seeks here overlap substantially with requests he issued to Mr. Allen in Mr. Snyder's arbitration with the Team's former minority owners. This overlap includes all materials Mr. Allen has concerning Mr. Snyder, the Team, recent allegations in the press regarding Mr. Snyder, and communications with Mr. Moag or Ms. Blair. (*Cf.* Petition at 11 *with* Allen Decl., Ex. 3.)

Fifth, Mr. Snyder demands documents and information about topics that, despite his assertions to the contrary, are anything but narrowly tailored to the Indian Action. In Mr. Snyder's §1782 proceeding against Mrs. McCloughan, Magistrate Judge Neureiter again aptly concluded:

> the breadth of the search terms proposed, coupled with the professed desire to obtain evidence of any communications between Mrs. McCloughan and The Washington Post's reporters, indicates that the subpoenas directed at Mrs. McCloughan may be less of a bona fide effort to obtain evidence supportive of the claims brought in the Indian Action, than they are an effort to burden and harass individuals formerly associated with the Washington Football Team….

(Ex. F, Order at 7.) Other courts facing broad §1782 discovery have concluded the same. *See, e.g.*, *In re O2CNI Co.*, No. C 13-80125 CRB (LB) at *24 (sweeping requests suggest petitioners "are seeking the information for their own use and not for use in the Korean criminal case"); *Lazaridis v. Int'l Centre for Missing*, 760 F. Supp. 2d 109, 115 (D.D.C.

14

2011) ("wide-ranging request suggests that [petitioner] is seeking information more for his general use than for use by the Greek tribunals"). In short, the Petition against Mr. Allen constitutes a misuse of §1782, which this Court should not countenance.

**II.     Mr. Snyder's unfounded and vexatious abuse of §1782 against Mr. Allen warrants an award of Mr. Allen's reasonable attorneys' fees and costs.**

Under §1782 and Rule 45, Mr. Snyder had a duty to take reasonable steps to avoid imposing undue burden or expense on Mr. Allen, a third party to the Indian Action. To enforce this duty, Rule 45(d)(1) expressly declares that an appropriate sanction includes reasonable attorneys' fees. In addition, under 28 U.S.C. §1927, Mr. Snyder's attorneys must not unreasonably or vexatiously multiply the proceedings in any case. Moreover, this Court has inherent authority "to fashion an appropriate sanction for conduct which abuses the judicial process," and an assessment of fees is "undoubtedly" within this power. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44-45 (1991). The Petition here lacked merit and should not have been granted, and Respondent has incurred unnecessary expense in responding to it. Furthermore, this is not an isolated §1782 Petition. Mr. Snyder has initiated numerous such proceedings around the country and may continue to do so. Sanctions are therefore fully justified here.

**III.    Alternatively, the Court should modify or limit the Subpoenas to protect Mr. Allen from annoyance, oppression, or undue burden or expense.**

The Supreme Court has made clear that, under §1782, "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel Corp.*, 542 U.S. at 265. Federal Rules of Civil Procedure 26(c)(1) and 45(d)(3) also empower courts to protect non-parties from discovery that causes annoyance, embarrassment, oppression, undue burden or expense. The overbreadth of Mr. Snyder's discovery requests and invasion of privacy – and chilling impact on free speech - they impose fully justify a protective order here.

**A. Mr. Snyder's discovery requests go far beyond anything remotely relevant to the Indian Action.**

As the party issuing the Subpoenas, Mr. Snyder "must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the

15

1  proceedings." *Optimize Tech. Solutions, LLC v. Staples, Inc.*, No. 14-MC-80095, 2014 WL 1477651, at *2 (N.D. Cal. Apr. 14, 2014). In the Indian Action, he asserts claims for defamation *per se* against the MEAWW website, Eleven Internet Services, and the authors of the Epstein Articles. (Petition at 2.) Mr. Snyder contends that he "has tailored his narrow requests to seek only those materials relevant to the Indian Action." (Petition at 12-13.) Even a cursory review of the categories of requested documents reveals that contention to be false. Only one of Mr. Snyder's requests reasonably focuses on discovering relevant and material evidence—*i.e.*, request for documents #3 concerning "MEAWW, Eleven and/or any affiliates, agents or employees thereof." And the response to that is simply that Mr. Allen has no such documents. (Allen Decl. ¶¶ 12-15.)

Mr. Allen was with the Team for a decade. He stays in contact with people he met during this time and continues to talk to others about the Team and the NFL. For these reasons, requests #1 and #2 call for voluminous documents completely unrelated to the Indian Action. Indeed, the Subpoenas define the relevant timeframe as starting January 1, 2020, immediately following Mr. Allen's termination. Mr. Allen then had a compensation dispute with Mr. Snyder entirely unconnected to the Indian Action.

Likewise, as Mr. Snyder is a high-profile individual who frequently appears in the press, that portion of document request #4 addressing "any actual or anticipated negative publicity concerning Mr. Snyder" implicates all manner of media coverage entirely unrelated to the Epstein Articles. Such coverage, even when "negative," has no bearing on the Indian Action. Furthermore, request #5 is entirely duplicative of the prior requests. Although request #5 identifies individuals by name, it does so in a non-inclusive way. In any event, neither Ms. Blair nor Mr. Potter are mentioned anywhere in the Petition, and Mr. Snyder has offered no reason why those individuals are pertinent to Mr. Allen. Lastly, Mr. Snyder's requests implicate privileged attorney-client communications, including about Mr. Allen's compensation dispute with Mr. Snyder and the instant Petition and Subpoenas. Section 1782 expressly exempts from its reach privileged materials, and Mr. Snyder is not entitled to them.

### B. To protect Mr. Allen's privacy, Mr. Snyder's use of any responsive, non-public information should be restricted to the Indian Action.

Mr. Snyder's requests demand that Mr. Allen disclose personal documents, including "emails, text messages, and/or phone records." Mr. Allen uses only one email account and one cell phone number for both business and personal purposes. (Allen Decl. ¶ 35.) Therefore, to protect Mr. Allen's privacy interest in responsive communications, if any, with his family members and friends, any use by Mr. Snyder should be strictly limited to the Indian Action. Section 1782 is restricted to obtaining evidence solely "for use in" a foreign tribunal. As such, if any §1782 discovery is permitted here (which it should not be), such a protective order restricting the use of Mr. Allen's information and documents is imperative to protect the integrity of these proceedings.

## CONCLUSION

For the foregoing reasons, Mr. Allen respectfully requests that the Court vacate the *Ex Parte* Order and quash Mr. Snyder's Subpoenas and dismiss the Petition. Alternatively, Mr. Allen requests that the Court enter a Protective Order narrowly tailoring the Subpoenas to allow Mr. Snyder to confirm that Mr. Allen has no information relevant to any issue in the Indian Action that purportedly justifies this §1782 Petition.

Dated this this 14th day of May 2021.

GREENBERG TRAURIG, LLP

By: */s/ Stephanie J. Quincy*
    Stephanie J. Quincy, SBN 014009
    Aaron J. Lockwood, SBN 025599
*Attorneys for Respondent Bruce Allen*

**CERTIFICATE OF SERVICE**

☒  I hereby certify that on May 14, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

>Gregory J. Marshall
>Patrick A. Tighe
>SNELL & WILMER L.L.P.
>One Arizona Center
>400 E. Van Buren, Suite 1900
>Phoenix, Arizona 85004-2202
>gmarshall@swlaw.com
>ptighe@swlaw.com
>
>Jordan W. Siev
>REED SMITH LLP
>599 Lexington Avenue, 22nd Floor
>New York, New York 10022
>jsiev@reedsmith.com
>
>*Attorneys for Petitioner Daniel Snyder*

By: */s/ Barrie Peagler*
Employee, Greenberg Traurig, LLP