# EXHIBIT D



# Transcript of Podcast Excerpt - Interview of Joseph Tacopina

**Date:** August 14, 2020

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
 3            WASHINGTON FOOTBALL TALK
 4     Three Outstanding interviews with Scott Turner,
 5       Terry McLaurin and Dan Snyder's attorney,
 6              plus, Reuben Foster
 9     Podcast interview of JOSEPH TACOPINA by JP FINLAY
20  Job: 315770
21  Pages:  1 - 19
22  Transcribed by:  Steph Mistele
```

## Page 2

```
 1                P R O C E E D I N G S
 3       JP FINLAY: Okay, we are very pleased to welcome
 4  in Joe Tacopina, who is the attorney for Dan Snyder
 5  in litigation, defamation lawsuits against some wild
 6  rumors that were spread after the Washington Post--
 7  or maybe even before the Washington Post report came
 8  out about sexual harassment inside the Washington
 9  Football Team organization.
10       Joe, I'm going to stop trying to talk because I
11  am bad when it gets into the nitty gritty of legal
12  matters. Maybe you can tell me what you're doing for
13  Mr. Snyder.
14       JOE TACOPINA: Sure. I mean, we're pursuing
15  people who were behind this really horrific story
16  about Mr. Snyder. A series of horrific stories--
17  false stories, including an article that linked him
18  to Jeffrey Epstein. I mean, perhaps the worst thing
19  you can do to an individual in this day and age is to
20  associate one with Jeffrey Epstein, the poster child
21  for pedophilia, for sexual abuse.
22       You know, Dan Snyder has nothing to do with
```

## Page 3

```
 1  him, had nothing to do with him, yet an article
 2  actually hit the internet and made its rounds on
 3  social media after the fact.
 4       That was an article the was put out by a
 5  company that we believe is a sort of corruptive
 6  information machine, serving as a higher gun to
 7  conceal bitters.
 8       We have sued that company in India. They've
 9  since removed the article, of course. They said, "Oh,
10  there was some mistakes in reporting." I mean, that's
11  not-- you know, mistakes in reporting is saying he
12  was born in '65 as opposed to '66. That's a mistake
13  in reporting. Mistake in reporting is not like
14  linking someone to Jeffrey Epstein and calling
15  someone a pedophile when you have a, you know, family
16  and children and a wife who has to (inaudible) this.
17       We believe there's, obviously, people behind
18  that who had their own purposes for doing it. And
19  this legal action that we brought, not only the
20  defamation lawsuit, but the 1782 federal court action
21  of the United States seeking evidence-- documentary
22  evidence, sworn testimony, to really uncover who's
```

## Page 4

```
 1  behind the scenes, who's pulling the strings, that
 2  got these articles printed.
 3       The legal action, we believe, will pierce the
 4  cloak of anonymity that this Meaww company, this
 5  media company from India, has used to protect
 6  nefarious clients.
 7       So, that's what this is about.
 8       JP FINLAY: So, who do you think is doing it?
 9       JOE TACOPINA: Well, we know that the person in
10  the front of some of this bidding was this Mary Ellen
11  Blair, a former disgruntled employee, who we filed a
12  1782 federal court action against (inaudible).
13       JP FINLAY: What is 1782 federal action mean?
14  They have to tell the truth or something?
15       JOE TACOPINA: It's a unique sort of thing
16  because it allows for evidence to be produced and
17  testimony to be taken with the court's permission in
18  the United States for a foreign action. In this
19  instance, we sued for defamation in India. And so--
20       JP FINLAY: Okay.
21       JOE TACOPINA: --this will uncover evidence that
22  was captured here in the United States. And that's
```

5

1 what that's about.
2     And really, you know, at this point, Mr. Snyder
3 will not stand by idly as criminals, for their own
4 malicious reasons, seek to soil his good name. And
5 that's what these were, these were criminal acts,
6 make no mistake about it. I'm not afraid to mince
7 those words.
8     But when people bribe people, and all for money
9 to present false stories about an individual, that's
10 a bribe. When people offer to wire money or do wire
11 money to perpetrate that fraud, that's a wire fraud.
12 When there's--
13     JP FINLAY: But this sounds kind of crazy,
14 right? I mean, this sounds...
15     JOE TACOPINA: It is crazy. And honestly, you
16 know, if we hadn't investigated it as thoroughly as
17 we had, it'd be hard for me to believe.
18     And you really-- it's the level-- but I've also
19 seen something that is, you know, we sort of, I
20 think, take for granted, but Daniel Snyder's a real
21 person. He's a terrific-- he and his wife Tanya are
22 terrific people. They have three beautiful children.

6

1 They do a lot for their community. They do a lot of
2 philanthropic things. And to be-- come under attack
3 by people who have criminal intent and criminal
4 motive, and plant articles that are intended to
5 destroy one's reputation and really hurt a family, is
6 something that I won't stand by idly. I'll come down
7 like a legal hammer on anyone who's behind this, and
8 we will get to who's behind this.
9     But we know-- we have strong evidence that Mary
10 Ellen Blair was doing the bidding and complicit and
11 in the pocket of another-- at least one other
12 individual trying to defame Mr. Snyder.
13     You know, we have--
14     JP FINLAY: Who?
15     JOE TACOPINA: Who is what this is all about.
16 What the 1782 action was all about is who. We will
17 find out who through the course of this action. But,
18 you know, we have--
19     JP FINLAY: And the next question is, why?
20     JOE TACOPINA: That's another thing we hope to
21 find out in the course of this action. Look, I don't
22 want to speculate and for the purposes of our federal

7

1 court filings, I have to stay within the four corners
2 of that. Obviously, we've done an investigation and I
3 have my own beliefs and my own opinions, but before I
4 opine, I want to have rock solid evidence.
5     But, you know, there's a lot of things going on
6 in Washington right now regarding the club, and there
7 are people who may have some motives to falsely
8 attack Mr. Snyder. I'm not going to speculate as to
9 who they are or what it is, but what I do know is
10 that this one individual - this formal disgruntled
11 employee - has spoken to various witnesses-- various
12 individuals in attempts to get them to provide false
13 information about Dan Snyder. Speak to the media and
14 offer them money to do so and basically remunerate
15 them for doing these sorts of things.
16     We have sworn affidavits to back that up, and
17 we have audio tape recordings to back that up. So,
18 you know, we wouldn't be making these filings if we
19 weren't rock solid in our proof.
20     JP FINLAY: This is major. There's a lot going
21 on here, and I'm not a legal mind. So, forgive me if
22 my questions are kind of elementary. Does of any of

8

1 this have anything to do with the 40% of the team
2 that's up for sale?
3     JOE TACOPINA: You know, there's, again,
4 there's, I think common sense will sort of play out.
5 I think the evidence in this case will present us
6 with who's behind this. But I can't-- I just won't.
7 It wouldn't be appropriate for me to speculate or
8 give my opinion on what this is about.
9     But, you know, I read some articles today in
10 various publications that sort of make that
11 connection. That's, you know, any journalist is free
12 to do that, I think. You know, they're using whatever
13 common sense they want to apply, but I'm not going to
14 do this at that time.
15     Again, this is-- the purpose of this is the
16 first step in this legal action to try to uncover
17 information as to who's behind this. This one
18 individual has identified people when speaking to
19 others, and we'll see. We're looking to get her under
20 oath and take some testimony.
21     JP FINLAY: I mean, I know there was an article
22 in the New York Times. It's kind of specifically

**9**

1  about this. What do you say as the attorney for Dan
2  when people ask, "Hey, if you just let this go,
3  everybody will stop talking about it and it'll go
4  away"?
5      JOE TACOPINA: You know what? Dan is quite a
6  courageous individual. He's doing this, not only for
7  himself and his family, but there's a whole host of
8  other people out there, including other owners.
9      I mean, just imagine every time you have a
10 dispute with someone or you want to try to put them
11 in a position of weaken stance or try to get them out
12 of an organization, you spread false rumors.
13     But not rumors, horrifically inaccurate
14 slanderous stories about someone and get it
15 published, and then have that publication be
16 retweeted and reposted on the internet all over the
17 place. And your kids are reading and people are
18 approaching your kids and your wife.
19     And so, you know what? Even if this story--
20 look, and that organization took that article down -
21 that Jeffrey Epstein article - because it's false.
22 It's outrageous. It's defamatory. It's slanderous.

**10**

1  It's criminal. They took it down, but that's not the
2  end of it. Okay? Because now we're at the point now,
3  Dan will not stand by idly as these criminals, for
4  their own malicious reasons, whatever those reasons
5  may be, seek to soil his good name through outrageous
6  lies. It's just not going to happen. I'm not going to
7  let it happen and neither will he.
8      JP FINLAY: All right, so, well, that's clear.
9  It's not going to happen. You're pursuing this thing.
10 The investigation you guys conducted. Is this happen-
11 - I mean, this all happened within the last three
12 weeks or so? Or were you guys digging around on this
13 prior to the Washington Post report?
14     Because the week where the world was waiting
15 for that Post report is when, at least on my end, the
16 amount of rumors started to go crazy. And I'll be
17 honest, I've never even heard of this meaww.com,
18 whatever they're called. I never saw the article, but
19 I know how things spread, especially on, you know,
20 Twitter, Facebook. If something's out there and it
21 starts getting shared, there's a butterfly effect
22 across a lot of mediums.

**11**

1      But it does it not matter that it's some random
2  website that nobody has heard of?
3      JOE TACOPINA: It matters. Of course, it wasn't,
4  you know, the New York Times, the Washington Post or
5  anything like that, NBCSports.com, but it was-- it
6  was a publication that was put out there and that was
7  picked up. And picked up to the point where it
8  reached his home and his children and his wife and
9  his friends and his community.
10     So, I don't care what the name of the
11 publication is. The fact that someone planted a false
12 story-- again, not just a false story, but a
13 horrifically damaging false story about Dan Snyder
14 that couldn't be further from the truth, is something
15 that, you know, we're going to hold them accountable
16 for because, again, these are crimes that were
17 committed. This is not just a--
18     JP FINLAY: Well, and the allegation is that
19 they did this-- they paid their way to do this and
20 they did it as part of a larger conspiracy, right?
21     JOE TACOPINA: Yeah.
22     JP FINLAY: That's heavy duty.

**12**

1      JOE TACOPINA: We have proof that witnesses were
2  offered money - money - to provide negative false
3  information about Dan.
4      JP FINLAY: I'm a journalist and I'm pretty much
5  for sale on about everything. If you want me to start
6  reading ads for your law office on my podcast, I'm
7  available, Joe. But none of us are available for hire
8  to spread falsehoods, right?
9      JOE TACOPINA: Those who are journalists, and
10 there is journalistic integrity and (inaudible)
11 reason, and we have an affidavit also about this
12 company in particular, this Meaww and how they
13 operate. It's, you know, obviously they're in India
14 and they're operating with very different
15 journalistic standards.
16     And you know, the fact that they wrote a
17 horrific article like that, pulled it right down and
18 then came up with some, I mean, almost laughable
19 excuse as to what happened-- errors in reporting. I
20 mean, you know, it's not going to cut it. And we have
21 proof that that company is a disinformation machine
22 that is serving hired guns and concealed bitters.

### Page 13

1   JP FINLAY: What's your goal with this thing?
2   The goal is not to prosecute in India, right? I
3   imagine you want everything to happen here in the old
4   US of A?
5       JOE TACOPINA: We are-- we did sue that company
6   in India. That's for sure. But, yes, here's our goal,
7   and here's Mr. Snyder and Tanya's goal and the Snyder
8   family and anyone who cares about what's fair and
9   just and right. The goal is to ensure that the full
10  weight of the law comes down heavily on those
11  responsible for these heinous acts. That's the goal,
12  and that's what will happen. And then make sure that
13  people understand, if they even think about doing
14  something as stupid as this, they're going to have
15  hell to pay.
16      JP FINLAY: How did you narrow it down? Is it
17  Mary Ellen Blair? Do I have the name right?
18      JOE TACOPINA: That's one. Yes, that's right.
19      JP FINLAY: How did you zero in on her in such a
20  short time period?
21      JOE TACOPINA: We have a good investigative
22  team. I mean, that's how we did it. But also--

### Page 14

1       JP FINLAY: Is that your background? Are you an
2   investigative attorney?
3       JOE TACOPINA: Yeah, I'm a former prosecutor.
4   But it's not so much me. We have a team of attorneys.
5   Believe me, I'm the low guy on the totem pole when it
6   comes to the brainpower in this group here and when
7   it comes to the investigative skills of our team.
8   But, you know, we have former law enforcement
9   officials are part of our team who dug.
10      You know, a lot of this was real easy to find
11  because people came to us. People came to Dan and
12  said, you know, "I was approached and here's what
13  they said." And these people were willing to give
14  under oath sworn affidavits under the penalties of
15  perjury that what was said to them was truthful.
16  Other individuals recorded conversations.
17      So, as I said, you know, we sit here pretty
18  confident about where this is going.
19      JP FINLAY: Wow. This is-- I've been covering
20  the Washington Football Team in some capacity for
21  about 8 seasons and you never know what corner you're
22  going to turn next.

### Page 15

1   One of the critics would point to Dan and say
2   he's been litigious throughout his term as ownership.
3   Even if this is entirely different than things in the
4   past - suing the city paper, suing season
5   ticketholders, whatever - do you think that's a
6   problem for him to be seen as litigious?
7       JOE TACOPINA: Look, I know who he is as a human
8   being, as a person, as an owner, as-- I mean, he's
9   one of the-- he's a great American success story. His
10  team is one of the greatest franchises in sports.
11      And honestly, you know, what he's been
12  litigious about in the past, I've not been involved
13  in, so I really can't speak that. And I honestly
14  don't care about it.
15      What I care about is what happened here and the
16  facts that have been uncovered here are absolutely
17  outrageous. And really, I think anyone with courage
18  and the wherewithal to fight back, would fight back.
19  I've seen emotions-- raw emotions from that family
20  based on things that were written about him that were
21  not true. You know, it bothers me-- troubles me that
22  anyone should have to go through that no matter how

### Page 16

1   litigious they may be or may not be.
2       But no one asked for this, and no matter what
3   happens in a courtroom where people have legal
4   disputes all the time, you know, you play by the
5   rules. But this is not playing by the rules. If
6   someone's trying to get a tactical advantage by
7   trying to smear him, defame him, slander him, and
8   thinks that somehow that's going to help in a legal
9   proceeding, they're wrong. And that's not how the
10  process works.
11      JP FINLAY: Joe, I got to say, I really
12  appreciate your time. And I want to say this on the
13  record for posterity, I don't want to mess with you,
14  man. I don't want you-- I don't want to be on your
15  bad side.
16      JOE TACOPINA: I'm here for you, JP, if you need
17  me, but I don't think you'll be in that position
18  ever, hopefully.
19      JP FINLAY: I hope not too. Where are you? Are
20  you in New York? Are you DC? Where you based?
21      JOE TACOPINA: New York City. Yes.
22      JP FINLAY: How on earth are you a Canadians fan

**17**

1 if you're in New York?
2      JOE TACOPINA: Grew up playing some junior
3 hockey in Verdun, a suburb of Montreal. Just, you
4 know, before the internet was a thing, and I used to
5 spend a lot of time at The Forum. And you know, if
6 you've been to the Montreal Forum, you'd fall in love
7 real quick. That's a different place. It's the mecca
8 of-- it was the mecca of hockey. And certainly,
9 seeing guys like Guy LaFleur or Ken Dryden and
10 players like that, sort of change your perspective on
11 hockey. So, that's it. Once a Habs fan, always a Habs
12 fan.
13      JP FINLAY: I get that for sure. That's kind of
14 how I stumbled into my line of work, is I loved the
15 Washington Football Team as a kid and saw some really
16 great players, some really teams. Obviously,
17 everybody hopes it can back to that. Do you know Alan
18 May? Played for the Caps, is a broadcaster now.
19      JOE TACOPINA: Yeah. I remember him, yeah.
20      JP FINLAY: You kind of look like him. Like, you
21 give off that tough guy hockey vibe and (inaudible)
22 has the same thing. It's working for you.

**18**

1      JOE TACOPINA: He's a bit of a tough guy,
2 (inaudible)?
3      JP FINLAY: Indeed. I think still is. I
4 wouldn't-- I wouldn't mess with you, and I wouldn't
5 mess with him. Joe, thank you for your time. I
6 appreciate it, and who knows, maybe we'll speak
7 again.
8      JOE TACOPINA: Okay, guys, anytime. I'm here.
9
10
11      (The recording was concluded.)
12
13
14
15
16
17
18
19
20
21
22

**19**

1              CERTIFICATE OF TRANSCRIBER
2      I, Steph Mistele, do hereby certify that
3 the foregoing transcript is a true and correct record
4 of the recorded proceedings; that said proceedings
5 were transcribed to the best of my ability from the
6 audio recording and supporting information; and that
7 I am neither counsel for, related to, nor employed by
8 any of the parties to this case and have no interest,
9 financial or otherwise, in its outcome.
10
11
12
13 _Steph Mistele_____
14 Steph Mistele
15 August 17, 2020
16
17
18
19
20
21
22