# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| **In re Application of Daniel Snyder for an Order Directing Discovery from Mary Ellen Blair and Comstock Holding Companies, Inc. Pursuant to 28 U.S.C. § 1782** | **Misc. Action No. 1:20-mc-00023** |

**OPPOSITION TO APPLICATION FOR AN ORDER
DIRECTING DISCOVERY FROM COMSTOCK HOLDING COMPANIES, INC.**

Nicholas M. DePalma (VSB 72886)
Christian R. Schreiber (VSB 89544)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons, VA 22182
Tel: (703) 905-1455
Fax: (703) 821-8949
nmdepalma@venable.com
crschreiber@venable.com

*Counsel for Comstock Holding Companies, Inc.*

i

## Table of Contents

Introduction ........................................................................................................................... 1

Relevant Background .......................................................................................................... 3

I.     Snyder files the India Action on August 7, 2020 for defamation based on several Internet articles and seeks an order directing Defendants to disclose who hired them and where they obtained information ........................................................................ 3

II.    Snyder circumvents the India Action by filing here on August 10, 2020 .......................... 3

III.   Snyder's two limited allegations about Comstock are inaccurate ...................................... 4

IV.   There are other indicia that Snyder is pursuing discovery for purposes other than the India Action ............................................................................................................ 5

Legal Standard .................................................................................................................... 8

Argument ............................................................................................................................ 9

I.     The Court should deny the petition to serve subpoenas on Comstock and issue a protective order because Snyder cannot satisfy the "for use" statutory requirement because allowing the discovery would circumvent the India Action ................................ 9

II.    In the alternative, the Court should deny the petition and issue a protective order because Snyder's subpoenas are pure speculation and accompanied by indicia of an improper purpose .............................................................................................................. 10

     A.    The subpoenas are a speculative fishing expedition ............................................. 10

     B.    The subpoenas seek information irrelevant to the India Action ........................... 12

     C.    The subpoenas are overbroad .............................................................................. 13

     D.    The subpoenas bear indicia of an improper purpose ........................................... 13

III.   In the alternative, the Court should deny the Petition and issue a protective order because any information can be obtained from other, more convenient sources ............ 14

IV.   Comstock does not own or manage the buildings at issue ................................................ 15

Conclusion .......................................................................................................................... 16

**Introduction**

At best, Petitioner Daniel Snyder's request to take discovery from Comstock Holding Companies, Inc. ("Comstock") is a fishing expedition. Snyder speculates that because: (1) Respondent Blair "left on bad terms," (2) admitted to others she had spoken with the *Washington Post*, and (3) experienced financial difficulties—it is "highly questionable" whether she can afford $2,100 in rent. Snyder then concludes that Blair must get a special discount or have a "financial benefactor."

It is over the line for Snyder to use this speculation to serve a subpoena on the company he contends (inaccurately) is Blair's landlord. If Snyder gets discovery from Comstock and confirms that his speculation is unfounded, then who is next? Does he pursue Blair's car dealer, online grocer, and credit card company? If Snyder comes up empty, does he then subpoena the next ex-employee on the list? The same reasoning would justify each of these actions.

More likely, Snyder's request is an attempt to leverage the discovery process for an improper motive; namely, to publicly cast aspersions on one of the minority owners of the Washington Football Team: Dwight Schar, and his family. First, Snyder's Petition does not satisfy the mandatory elements of Section 1782, including that the discovery be "for use" in a foreign action. In his foreign action, Snyder seeks "an order directing the Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information." Docket No. 1-9 ¶ 45(f). Leveraging this Court to get that relief early is not "for use" in a foreign proceeding.

Second, Snyder's lawyer, Joseph Tacopina, boasted in a recent podcast that Snyder's goal is not to prosecute in India, but to gather facts for U.S.-based litigation:

> *JP FINLAY: What's your goal with this thing? The goal is not to prosecute in India, right? I imagine you want everything to happen here in the old US of A?*

1

JOE TACOPINA: We are -- we did sue that company in India. That's for sure. ***But, yes,*** here's our goal …. The goal is to ensure that the full weight of the law comes down heavily on those responsible ….

**Exhibit 1** at 13:1-11 (partial transcript of 8/14/2020 interview with J. Tacopina) (emphasis added). This admission further prevents Snyder from satisfying the "for use" requirement of Section 1782.

Third, Snyder's limited allegations against Comstock are inaccurate. As explained in the Declaration of Jubal Thompson, Comstock's Executive Vice President and General Counsel ("Thompson Declaration"), Respondent does not own either of the buildings at issue and does not serve as the property manager for either of the buildings at issue. But more importantly, Snyder's allegations that Blair receives a discount appears intentionally misleading as all Washington Football Team players and staff who reside or have resided at BLVD Reston Station and BLVD Loudoun Station, including its current Head Coach Ron Rivera, receive rental benefits (like the waiver of application fees)—not because there is a secret financial benefactor—but because of specific requests made by the Washington Football Team and a long standing informal policy of Mr. Schar offering BLVD Reston Station and BLVD Loudoun Station to Washington Football Team players and staff at the request of or as an accommodation to Snyder.

Fourth, one of Comstock's independent directors, Norman Chirite, who owed Comstock fiduciary duties (including duties of loyalty and confidentiality), abruptly resigned just five days before Snyder initiated this action. Chirite, who is now currently employed by Snyder, is the former Managing Director of Red Zone Capital Management and the former Executive Vice President and General Counsel of the Washington Football Team. His abrupt resignation indicates a conflict far beyond a simple nonparty discovery request.

Snyder is not entitled to discovery from Comstock, regardless of whether his request is based on speculation or an improper purpose.

**Relevant Background**

I.     **Snyder files the India Action on August 7, 2020 for defamation based on several Internet articles and seeks an order directing Defendants to disclose who hired them and where they obtained information**

1.     Snyder alleges that he has "asserted a claim for defamation" in India against several Indian entities involved in the publication of Internet articles that "falsely accuse him of a broad array of acts of criminal sexual misconduct." Docket No. 1 ¶¶ 16, 20.

2.     Snyder attaches a copy of the charging document. *See* Docket No. 1-9. Among the defendants in the India Action are the publishers of the Internet articles, their owners, their writers, and all others who caused the article to be published. *Id.*

3.     Snyder seeks relief in the India Action including: "an order directing the Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information qua the said impugned articles ...." Docket No. 1-9 ¶ 45(f).

II.    **Snyder circumvents the India Action by filing here on August 10, 2020**

4.     Rather than try to prevail in India, Snyder filed the instant action in this Court because, "upon information and belief," Snyder alleges that "Blair either furnished, or procured for, the defendants in the India Action false and unsubstantiated claims ...." Docket No. 1 ¶ 24.

5.     The limited bases for Snyder's "information and belief" appear to be:

a.     Blair "left on bad terms" (*id.* ¶ 31);

b.     Blair has "financial difficulties" because "[h]er wages have been garnished, ... she has a substantial history of judgments and liens ... and she has been evicted several times" (*id.* ¶¶ 33-34); and

c.     Blair "has stated that she received discounted rent between 2015 and at least late 2017 at two buildings owned by Comstock," that "since 2018, she has paid $2,100 a month in rent," and that "[h]er ability to afford this monthly

3

rent seems highly questionable ….” *Id.* ¶ 34.

6.      Snyder also vaguely references phone calls between Blair and other Washington Football Team employees in which Snyder alleges “Blair had been asked about her contacts on the [Washington Football] Team” and an article would be published in the *Washington Post* that “would ‘not [be] good for Dan.’” *Id.* ¶¶ 35-36 (second alteration in original).

7.      Snyder alleges that the *Washington Post* did, in fact, publish articles, including one on July 5, stating “minority owners of the [Washington Football] Team were looking to sell their stakes” and were “not happy being a partner” of Snyder (*id.* ¶ 37), and one on July 16, “alleging instances of sexual harassment against [Washington Football] Team employees” (*id.* ¶ 43).

8.      Snyder alleges that the defendants in the India Action also published at least one of the “Defamatory Articles” on July 16, 2020. *Id.* ¶ 43.

9.      Snyder alleges that Blair “told at least the employees of the [Washington Football] Team and Petitioner discussed herein that she was in contact with and working in coordination with a third party—not a journalist, but rather someone well known to each of the involved persons—and that both that third party and Blair were involved in the preparation of one or more articles expected to be harmful to Petitioner.” *Id.* ¶ 45.

10.     Snyder alleges that Blair exhibits “knowledge of upcoming, non-public events in other contexts.” *Id.* ¶ 47. Blair allegedly “told a [Washington Football] Team employee who interacts with Petitioner frequently that she had been in contact with the Federal Bureau of Investigation about another [Washington Football] Team employee” and that later that “employee was arrested by the FBI.” *Id.*

**III.     Snyder’s two limited allegations about Comstock are inaccurate**

11.     The following two allegations are the sum total that Snyder provides to justify serving subpoenas on Comstock: (1) Blair lived in two buildings “owned by Comstock”; and (2)

Blair received discounted rent. Docket No. 1 ¶¶ 8, 34.

12.     Each allegation is inaccurate. ***First,*** as explained in the Thompson Declaration, Comstock does not own either of the buildings at issue, BLVD Reston Station or BLVD Loudoun Station. Thompson Decl. ¶¶ 11, 13, 31. Each building is owned by a single asset entity and managed by an affiliate of Comstock. *Id.*

13.     Snyder knows or should know that Comstock does not own these buildings and is fully aware that it has been commonplace for players, coaches, and staff members of the Washington Football Team to occupy apartments at BLVD Reston Station and BLVD Loudoun Station for years. *Id.* ¶ 29.

14.     In fact, the Washington Football Team rented one unit at BLVD Reston Station for the Washington Football Team's head coach.  *Id.* ¶ 30. This unit was personally inspected by Snyder's wife, Tanya Snyder, prior to the coach's occupation of the unit.

15.     ***Second***, although Snyder suggests that Blair received a special discount, Blair received the same discounts provided to Washington Football Team coaches, players, and staff members by virtue of her association with Snyder and the Washington Football Team. *Id.* ¶ 29. These facts ought to be known to Snyder given his position with the Washington Football Team and the Washington Football Team's employment of other tenants at the buildings.

## IV.    There are other indicia that Snyder is pursuing discovery for purposes other than the India Action

16.     ***First***, Snyder recently hired away one of Comstock's special independent directors, Norman Chirite, a former employee of the Washington Football Team. Chirite served on Comstock's Board of Directors and had Independent Director responsibilities. Thompson Decl. ¶ 27. Chirite acquired substantial Confidential Information during his tenure. *See* Letter to N. Chirite dated August 19, 2020 (attached as Exhibit 7 to the Thompson Declaration). Chirite abruptly

5

resigned from Comstock two days before Snyder filed the India Action. Thompson Decl. ¶ 27.

17.     Given the timing of Chirite's resignation, the lack of detail provided, and the abrupt nature of the departure after fourteen years serving on Comstock's Board of Directors, Comstock believes that Snyder's motives in filing this action influenced Chirite's resignation and its timing— and it reflects that Snyder's petition against Comstock is far more than a request for discovery for use in a foreign proceeding. *Id.* ¶ 28. Comstock is implementing all measures at its disposal to ensure that Chirite complies with his continuing fiduciary and contractual duties to Comstock, including to protect Comstock's valuable and confidential information from Snyder. Thompson Decl. Ex. 7.

18.     *Second,* Snyder hired Virginia co-counsel, Reed Smith LLP (Reed Smith) to handle this matter locally. Reed Smith is long time counsel to Comstock and its affiliated companies for well over a decade and Comstock does not believe that Snyder's selection of one of Comstock's longest tenured law firms was coincidental. Reed Smith has subsequently moved to withdraw as counsel.

19.     *Third*, Snyder's lead counsel, Tacopina (also on the papers in this 1782 action), has actively encouraged a connection between this action and Washington Football Team minority owner Schar:

> Monday's filing appears to mark an intensification in an ongoing dispute between Snyder and three minority owners of the [Washington Football] team over the franchise's direction. While his name is not mentioned in the filing, Dwight Schar, one of those minority owners seeking to sell his share of the [Washington Football] team, is the father-in-law of Comstock chief executive Christopher Clemente....

> \*\*\*

> Tacopina declined to answer when asked whether Dwight Schar is one of the people he believes financed the alleged online false information campaign.

6

> "We want to be able to depose Mary Ellen Blair, and get documents
> … before we go mentioning anyone by name. … But it's just a
> matter of time before this house of cards comes down," he said.

Will Hobson, *Daniel Snyder, in legal filing, accuses former team employee of spreading false stories*, Wash. Post, Aug. 10, 2020, https://www.washingtonpost.com/sports/2020/08/10/daniel-snyder-legal-filing-accuses-former-team-employee-spreading-false-stories/ (attached as **Exhibit 2**); *see also* Ken Belson & Katherine Rosman, *Washington N.F.L. Team Owner Files Claims Hinting at a Conspiracy*, N.Y. Times, updated Aug. 12, 2020, https://www.nytimes.com/2020/08/10/sports/football/washington-nfl-snyder-lawsuit.html (attached as **Exhibit 3**) (containing the same false allegation).

20.     Snyder's counsel pointed towards these articles during an interview on August 14, 2020. Tacopina made the following statements:

> JP FINLAY: This is major…. [A]nd I'm not a legal mind. So,
> forgive me if my questions are elementary. ***Does any of this have
> anything to do with the 40% of the [Washington Football] team
> that's up for sale?***
>
> JOE TACOPINA: ***You know, there's, again, there's, I think
> common sense will sort of play out. I think the evidence in this
> case will present us with who's behind this.… But, you know, I
> read some articles today in various publications that sort of make
> that connection.*** That's, you know, any journalist is free to do that,
> I think. You know, they're using whatever common sense they want
> to apply, but I'm not going to do [that] at [this] time. Again, this is—
> the purpose of this is the first step in this legal action to try to
> uncover information as to who's behind this.

Exhibit 1 at 7:20-8:17 (emphasis added).

21.     ***Fourth***, Snyder's counsel conceded that the true purpose of the 1782 action in this Court is not to assist the India Action but instead to support a separate action in the United States:

> JP FINLAY: ***What's your goal with this thing? The goal is not to
> prosecute in India, right? I imagine you want everything to
> happen here in the old US of A?***

JOE TACOPINA: We are -- we did sue that company in India. That's for sure. ***But, yes,*** here's our goal …. The goal is to ensure that the full weight of the law comes down heavily on those responsible ….

*Id.* at 13:1-11(emphasis added).

## Legal Standard

"A [S]ection 1782 applicant must satisfy three mandatory factors by demonstrating that (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *In re FIMI-Finanziaria Immobiliare Italia S.R.L.*, 19-mc-584 (PKC), 2020 WL 4474839, at *2 (S.D.N.Y. Aug. 3, 2020) (second alteration in original) (internal quotation marks omitted) (denying application).

If the applicant satisfies the mandatory factors, the district court then weighs four factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), to determine whether discovery should be permitted. These factors are: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) "unduly intrusive or burdensome requests may be rejected or trimmed." 542 U.S. at 264-65.

If an application for a subpoena under 28 U.S.C. § 1782 is granted, a respondent may challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45, and may also seek a protective order under Rule 26. *See In re Edelman*, 295 F.3d 171, 178-79,

181 (2d Cir. 2002) (explaining that restrictions and protections of Rules 45 and 26 apply to subpoenas issued under 28 U.S.C. § 1782, and remanding for district court to consider whether Rule 45 required that the subpoena be quashed); *see also* 28 U.S.C. § 1782(a) (providing that discovery shall be provided "in accordance with the Federal Rules of Civil Procedure").

Under Rule 45, "the court for the district where compliance is required must quash or modify a subpoena that … subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3). Similarly, Rule 26 provides that a court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including "forbidding the disclosure or discovery." Fed. R. Civ. P. 26(c)(1).

### Argument

**I.      The Court should deny the petition to serve subpoenas on Comstock and issue a protective order because Snyder cannot satisfy the "for use" statutory requirement because allowing the discovery would circumvent the India Action**

"[A] request for discovery under § 1782 that is plainly irrelevant to the foreign proceeding will fail to meet the statutory 'for use' requirement." *In re Schlich*, 893 F.3d 40, 52 (1st Cir. 2018) (affirming denial of discovery as irrelevant).

Here, Snyder cannot satisfy the statutory "for use" requirement because Snyder is already seeking this information as part of the ultimate relief in the India Action. Specifically, Snyder seeks an "order directing the Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information." Docket No. 1-9 ¶ 45(f). Snyder cannot leverage Section 1782 for the discovery he seeks because that would bypass the requirement that Snyder first prevail in the India Action. Snyder's petition is unaccompanied by a declaration from an expert on Indian law explaining whether Snyder is entitled to discovery in India and whether he can receive this information in that forum.

## II.   In the alternative, the Court should deny the petition and issue a protective order because Snyder's subpoenas are pure speculation and accompanied by indicia of an improper purpose

"[E]ven when a discovery request is sufficiently relevant to be deemed 'for use' in a foreign proceeding, there is nothing that prevents district courts from considering relevancy under the discretionary *Intel* factors …. Where the information sought is only marginally relevant, the district court may decide to exercise its discretion to exclude the evidence because other concerns outweigh the need for the discovery." *In re Schlich*, 893 F.3d at 52. For example, "a district court should deny an Application under Section 1782 if it is 'made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials ... in toto, just as it can if discovery was sought in bad faith in domestic litigation.'" *Green Dev. Corp. S.A. De C.V. v. Zamora*, CASE NO. 15-21594-MC-GOODMAN, 2016 WL 2745844, at *3 (S.D. Fla. May 10, 2016) (alteration in original). And the U.S. Supreme Court has made clear that "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 265.

Under Rule 45, "[a] party may seek to quash or modify a subpoena on grounds of irrelevance or overbreadth, even though irrelevance and overbreadth are not explicitly listed as grounds to quash in Rule 26(c)(1) or Rule 45(c)(1), because either irrelevance or overbreadth necessarily establishes undue burden." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, Civil Action No. 3:16-MC-1, 2016 WL 1071016, at *5 (E.D. Va. Mar. 17, 2016). Rule 26(c)(1) also permits protective orders to protect a party from such undue burden.

### A.   The subpoenas are a speculative fishing expedition

Snyder's arguments in support of the Comstock subpoenas are surprisingly speculative. For example, Snyder recites that Blair left on bad terms and experienced financial difficulties. Snyder then jumps to the speculative conclusion that it is "highly questionable" whether she can afford $2,100 a month in rent. Docket No. 1 ¶ 34. He then jumps to the more speculative conclusion

10

that there must be a financial benefactor paying her rent. He then jumps to the more speculative conclusion that this financial benefactor was involved in creating the defamatory articles at issue in the India Action.

Snyder even goes so far as to argue that Blair's statement to other Washington Football Team employees about a *Washington Post* article should be construed to mean that Blair knew about the articles at issue *in India*. Regardless of whether this speculation can justify discovery from Blair, it is too far to jump from speculation against Blair to speculation against Blair's building owner, to speculation against her property management company, and, ultimately, speculation about Comstock.

Courts do not permit such fishing expeditions under the Rules. *See Cook v. Howard*, 484 F. App'x 805, 813 (4th Cir. 2012) ("While the Appellants assert that these materials may have led to discovery of admissible evidence, they present no intelligible explanation of how that is so, nor can we detect any; the requests have every indicia of the quintessential fishing expedition."); *EEOC v. Dolgencorp, LLC*, Civil No. SAG-18-2956, 2019 U.S. Dist. LEXIS 220340, at *5 (D. Md. Dec. 23, 2019) ("Because the subpoena is a quintessential 'fishing expedition,' I will grant the requested protective order and quash the subpoena.").

Nor do courts permit such irrelevant and speculative discovery under 28 U.S.C. § 1782. *See In re Green Dev. Corp. S.A. de C.V.*, Civil No. WDQ-15-2985, 2015 WL 10319091 (D. Md. Oct. 1, 2015) (recommending denial of petition under 28 U.S.C. § 1782, where the petitioner sought information from a party that the petitioner alleged had sent a defamatory article to the Honduras Supreme Court, and holding that discovery into the subpoenaed party's allegedly improper motive was not relevant to the pending proceeding before the Honduran court), *report and recommendation approved* 2016 WL 640791 (D. Md. Feb. 18, 2016) ("It is sheer speculation

that McNicholas was the source, or would have any knowledge of the source, of the copy of his article allegedly provided to a judge or judges on the Honduran Supreme Court."); *Zamora*, 2016 WL 2745844, at *1, 7 (granting motion to quash where "the rationale proffered for the discovery is speculative").

### B.     The subpoenas seek information irrelevant to the India Action

Snyder seeks eight categories of documents from Comstock, including: Blair's tenancy at any property managed by Comstock or any other affiliated property management company; Blair's lease applications, credit applications, and lease agreements for any units she currently rents or previously has rented at BLVD Reston Station or BLVD Loudoun Station; any guarantor on Blair's leases at BLVD Reston Station or BLVD Loudoun Station; Blair's rent and security payments for any units in BLVD Reston Station or BLVD Loudoun Station; the fair rental value of any unit that Blair currently is renting or previously has rented at BLVD Reston Station or BLVD Loudoun Station; and any lease incentives given to Blair in connection with her leasing units at BLVD Reston Station or BLVD Loudoun Station. *See* Docket No. 1-5. Snyder further seeks all documents and communications "between [Comstock] and any third parties concerning Blair." *Id.*

Snyder similarly provides a "non-exhaustive list of representative topics" on which Snyder seeks to depose a representative of Comstock, including: Blair's tenancy at BLVD Reston Station and BLVD Loudoun Station; Blair's rent payments; Blair's lease and credit applications for any apartment at BLVD Reston Station or BLVD Loudoun Station; any guarantor for Blair's apartments at BLVD Reston Station or BLVD Loudoun Station; Blair's tenancy at any other buildings or units managed by Comstock; and any financial incentives granted to Blair in connection with her leasing units owned, managed or operated by Comstock. *See* Docket No. 1-6.

None of the above information is relevant to the India Action. There, Snyder is suing

12

various parties in India for publishing an allegedly defamatory article about Snyder. Docket No. 1-9 ¶¶ 16-29. The issues concern whether the statements are false and defamatory, whether the defendants knew or had reason to know that those statements were false, and whether those statements damaged Snyder. Blair's residence at BLVD Reston Station or BLVD Loudoun Station and the information about her tenancy that Snyder seeks has no bearing on those issues.

### C.     The subpoenas are overbroad

Snyder seeks all documents and communications concerning "Ms. Blair's tenancy at any property managed by Comstock or any other affiliated property management company," as well as all documents and communications "between [Comstock] and any third parties concerning Ms. Blair." Docket No. 1-5 at Requests 1 and 5. But these broad categories of documents far exceed even Snyder's relevance argument. Similarly, Snyder's subpoena for deposition testimony seeks to leave open the possibility of questioning a Comstock representative on any topic imaginable, as the subpoena merely provides a "***non-exhaustive*** list of representative topics." Docket No. 1-6 (emphasis added). Thus, the Court should deny the petition because Snyder's subpoenas are overbroad. *See In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *7-8 (quashing subpoena).

### D.     The subpoenas bear indicia of an improper purpose

Under both *Green* and Rule 45, the Court may quash the subpoena and issue a protective order to protect a nonparty from harassment. Here, Snyder's focus on Comstock is accompanied by indicia of an improper purpose, including the resignation of Norman Chirite just days before filing this action, the hiring of Comstock's longest tenured law firm, the blatant misstatements and focus on Comstock despite Snyder's actual knowledge of the building owner, and the source of rental discounts evidenced by the tenancy of many Washington Football Team players and staff over the years—the most recent and notable one being the head coach of the Washington Football

13

Team, whose BLVD Reston Station unit was walked through and accepted by Tanya Snyder. Finally, Snyder's attorney answered "yes" during a podcast when asked whether his goal was to initiate U.S. based litigation. Exhibit 1 at 13:1-11.

### III.   In the alternative, the Court should deny the Petition and issue a protective order because any information can be obtained from other, more convenient sources

Rule 26 provides that, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed ... if it determines that ... the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). "Fed. R. Civ. P. 45's rules for quashing or modifying third-party subpoenas are subject to the general relevance discovery limitations of Rule 26. Thus, the Court must quash or modify a subpoena if the information sought is obtainable from another, more convenient source." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *8 (citations omitted); *see also* Fed. R. Civ. P. 45 (d)(2)(B)(ii) (stating that courts "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"). Similarly, Rule 26(c)(1) provides for protective orders to protect a party from undue burden.

Here, Snyder claims that the documents and information he seeks would demonstrate connections to MEAWW, which Snyder claims will bear on the issues in the India Action. Docket No. 1 ¶ 49. But documents regarding connections to MEAWW are in the possession of MEAWW itself and the parties responsible for publishing the articles: *i.e.*, the defendants in the India Action. "There is no reason to burden a third party with discovery when the opposing party has all of the information requested." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *8 (quashing subpoena and issuing protective order).

*In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.* is instructive. There,

14

Bona Fide Conglomerate, Inc. served subpoenas on ThompsonMcMullan, P.C. seeking documents for use in Bona Fide's suit against SourceAmerica in the Southern District of California. *Id.* at *1-2. Bona Fide sought documents related to a previous lawsuit brought by SourceAmerica, in which ThompsonMcMullan represented Bona Fide's general counsel. *Id.* at *2-3. The court agreed with ThompsonMcMullen that all such documents could be sought from SourceAmerica, who was a party to the Southern District of California case, and quashed the subpoena. *Id.* at *8-9. The court also rejected Bona Fide's claims that it had "serious concerns about its ability to obtain accurate, unfiltered information about the events and disclosures at issue" from SourceAmerica, concluding that Bona Fide could seek relief from the Southern District of California if SourceAmerica did not comply with its discovery obligations. *Id.* The Court also granted a protective order because even a more narrowly tailored subpoena would be inappropriate for the same reasons. *Id.* at *9.

Further, Snyder's lawyer, Tacopina, has suggested to the public that Snyder already has the information he seeks. Exhibit 1 at 14:10-18 ("You know, a lot of this was real easy to find because people came to us. People came to Dan and said, you know, 'I was approached and here's what they said.' And these people were willing to give under oath sworn affidavits under the penalties of perjury that what was said to them was truthful. Other individuals recorded conversations. So, as I said, you know, we sit here pretty confident about where this is going."); *id.* at 7:16-19 ("We have sworn affidavits to back that up, and we have audio tape recordings to back that up. So, you know, we wouldn't be making these filings if we weren't rock solid in our proof."). If Snyder is "rock solid" then he has no need to engage in a fishing expedition.

Finally, even if Snyder establishes an entitlement to these documents notwithstanding Comstock's arguments, all such documents are obtainable from Blair.

## IV.   Comstock does not own or manage the buildings at issue

The Court should deny Snyder's application for issuance of the subpoenas for the

independent reason that Comstock affiliates, not Respondent Comstock, own and manage the buildings at issue. Thompson Decl. ¶¶ 11, 13, 31.

## Conclusion

Snyder may be entitled to the relief he seeks in India. But Snyder cannot use Section 1782 proceedings to bypass that proceeding. Snyder's speculative arguments—coupled with public statements by his attorney concerning his motive for seeking discovery—prevent Snyder from satisfying the "for use" requirement of Section 1782. Snyder's promotional speculation and use of this Court for public relations purposes does not justify seeking discovery from Comstock under the Federal Rules in any event.

Dated: August 21, 2020                    Respectfully submitted,

                                          /s/_____
                                          Nicholas M. DePalma (VSB 72886)
                                          Christian R. Schreiber (VSB 89544)
                                          VENABLE LLP
                                          8010 Towers Crescent Drive, Suite 300
                                          Tysons, VA 22182
                                          Tel: (703) 905-1455
                                          Fax: (703) 821-8949
                                          nmdepalma@venable.com
                                          crschreiber@venable.com

                                          *Counsel for Comstock Holding Companies, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 21st day of August 2020, I caused a copy of the foregoing to be filed

electronically with the Court's CM/ECF system, which will send a Notice of Electronic Filing to

all counsel of record authorized to receive notice of such filing, including:

> Brittany Davidson
> REED SMITH LLP
> 7900 Tysons One Place, Suite 500
> McLean, VA 22102
> Tel: (703) 641-4200
> Email: bdavidson@reedsmith.com
>
> Rizwan A. Qureshi
> REED SMITH LLP
> 1301 K Street NW
> Suite 1000, East Tower
> Washington, DC 20005
> Tel: (202) 414-9200
> Email: rqureshi@reedsmith.com
>
> Joseph Tacopina (*subject to admission pro hac vice*)
> TACOPINA, SEIGEL & DEOREO
> 275 Madison Avenue
> New York, New York 10016
> Tel: (212) 227-8877
> Email: jtacopina@tacopinalaw.com
>
> *Counsel for Petitioner*

> /s/_____
> Nicholas M. DePalma (VSB 72886)
> Christian R. Schreiber (VSB 89544)
> VENABLE LLP
> 8010 Towers Crescent Drive, Suite 300
> Tysons, VA 22182
> Tel: (703) 905-1455
> Fax: (703) 821-8949
> nmdepalma@venable.com
> crschreiber@venable.com
>
> *Counsel for Comstock Holding Companies, Inc.*

17

# Exhibit 1



# Transcript of Podcast Excerpt - Interview of Joseph Tacopina

**Date:** August 14, 2020

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020

1 (1 to 4)

**Page 1**

```
               WASHINGTON FOOTBALL TALK

    Three Outstanding interviews with Scott Turner,

      Terry McLaurin and Dan Snyder's attorney,

               plus, Reuben Foster


   Podcast interview of JOSEPH TACOPINA by JP FINLAY











Job: 315770

Pages:  1 - 19

Transcribed by:  Steph Mistele
```

**Page 2**

```
              P R O C E E D I N G S

    JP FINLAY: Okay, we are very pleased to welcome

in Joe Tacopina, who is the attorney for Dan Snyder

in litigation, defamation lawsuits against some wild

rumors that were spread after the Washington Post--

or maybe even before the Washington Post report came

out about sexual harassment inside the Washington

Football Team organization.

    Joe, I'm going to stop trying to talk because I

am bad when it gets into the nitty gritty of legal

matters. Maybe you can tell me what you're doing for

Mr. Snyder.

    JOE TACOPINA: Sure. I mean, we're pursuing

people who were behind this really horrific story

about Mr. Snyder. A series of horrific stories--

false stories, including an article that linked him

to Jeffrey Epstein. I mean, perhaps the worst thing

you can do to an individual in this day and age is to

associate one with Jeffrey Epstein, the poster child

for pedophilia, for sexual abuse.

    You know, Dan Snyder has nothing to do with
```

**Page 3**

him, had nothing to do with him, yet an article actually hit the internet and made its rounds on social media after the fact.

That was an article the was put out by a company that we believe is a sort of corruptive information machine, serving as a higher gun to conceal bitters.

We have sued that company in India. They've since removed the article, of course. They said, "Oh, there was some mistakes in reporting." I mean, that's not-- you know, mistakes in reporting is saying he was born in '65 as opposed to '66. That's a mistake in reporting. Mistake in reporting is not like linking someone to Jeffrey Epstein and calling someone a pedophile when you have a, you know, family and children and a wife who has to (inaudible) this.

We believe there's, obviously, people behind that who had their own purposes for doing it. And this legal action that we brought, not only the defamation lawsuit, but the 1782 federal court action of the United States seeking evidence-- documentary evidence, sworn testimony, to really uncover who's

**Page 4**

behind the scenes, who's pulling the strings, that got these articles printed.

The legal action, we believe, will pierce the cloak of anonymity that this Meaww company, this media company from India, has used to protect nefarious clients.

So, that's what this is about.

JP FINLAY: So, who do you think is doing it?

JOE TACOPINA: Well, we know that the person in the front of some of this bidding was this Mary Ellen Blair, a former disgruntled employee, who we filed a 1782 federal court action against (inaudible).

JP FINLAY: What is 1782 federal action mean? They have to tell the truth or something?

JOE TACOPINA: It's a unique sort of thing because it allows for evidence to be produced and testimony to be taken with the court's permission in the United States for a foreign action. In this instance, we sued for defamation in India. And so--

JP FINLAY: Okay.

JOE TACOPINA: --this will uncover evidence that was captured here in the United States. And that's

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020

**5**

1 what that's about.

2 And really, you know, at this point, Mr. Snyder

3 will not stand by idly as criminals, for their own

4 malicious reasons, seek to soil his good name. And

5 that's what these were, these were criminal acts,

6 make no mistake about it. I'm not afraid to mince

7 those words.

8 But when people bribe people, and all for money

9 to present false stories about an individual, that's

10 a bribe. When people offer to wire money or do wire

11 money to perpetrate that fraud, that's a wire fraud.

12 When there's--

13 JP FINLAY: But this sounds kind of crazy,

14 right? I mean, this sounds...

15 JOE TACOPINA: It is crazy. And honestly, you

16 know, if we hadn't investigated it as thoroughly as

17 we had, it'd be hard for me to believe.

18 And you really-- it's the level-- but I've also

19 seen something that is, you know, we sort of, I

20 think, take for granted, but Daniel Snyder's a real

21 person. He's a terrific-- he and his wife Tanya are

22 terrific people. They have three beautiful children.

**6**

1 They do a lot for their community. They do a lot of

2 philanthropic things. And to be-- come under attack

3 by people who have criminal intent and criminal

4 motive, and plant articles that are intended to

5 destroy one's reputation and really hurt a family, is

6 something that I won't stand by idly. I'll come down

7 like a legal hammer on anyone who's behind this, and

8 we will get to who's behind this.

9 But we know-- we have strong evidence that Mary

10 Ellen Blair was doing the bidding and complicit and

11 in the pocket of another-- at least one other

12 individual trying to defame Mr. Snyder.

13 You know, we have--

14 JP FINLAY: Who?

15 JOE TACOPINA: Who is what this is all about.

16 What the 1782 action was all about is who. We will

17 find out who through the course of this action. But,

18 you know, we have--

19 JP FINLAY: And the next question is, why?

20 JOE TACOPINA: That's another thing we hope to

21 find out in the course of this action. Look, I don't

22 want to speculate and for the purposes of our federal

**7**

1 court filings, I have to stay within the four corners

2 of that. Obviously, we've done an investigation and I

3 have my own beliefs and my own opinions, but before I

4 opine, I want to have rock solid evidence.

5 But, you know, there's a lot of things going on

6 in Washington right now regarding the club, and there

7 are people who may have some motives to falsely

8 attack Mr. Snyder. I'm not going to speculate as to

9 who they are or what it is, but what I do know is

10 that this one individual - this formal disgruntled

11 employee - has spoken to various witnesses-- various

12 individuals in attempts to get them to provide false

13 information about Dan Snyder. Speak to the media and

14 offer them money to do so and basically remunerate

15 them for doing these sorts of things.

16 We have sworn affidavits to back that up, and

17 we have audio tape recordings to back that up. So,

18 you know, we wouldn't be making these filings if we

19 weren't rock solid in our proof.

20 JP FINLAY: This is major. There's a lot going

21 on here, and I'm not a legal mind. So, forgive me if

22 my questions are kind of elementary. Does any of

**8**

1 this have anything to do with the 40% of the team

2 that's up for sale?

3 JOE TACOPINA: You know, there's, again,

4 there's, I think common sense will sort of play out.

5 I think the evidence in this case will present us

6 with who's behind this. But I can't-- I just won't.

7 It wouldn't be appropriate for me to speculate or

8 give my opinion on what this is about.

9 But, you know, I read some articles today in

10 various publications that sort of make that

11 connection. That's, you know, any journalist is free

12 to do that, I think. You know, they're using whatever

13 common sense they want to apply, but I'm not going to

14 do this at that time.

15 Again, this is-- the purpose of this is the

16 first step in this legal action to try to uncover

17 information as to who's behind this. This one

18 individual has identified people when speaking to

19 others, and we'll see. We're looking to get her under

20 oath and take some testimony.

21 JP FINLAY: I mean, I know there was an article

22 in the New York Times. It's kind of specifically

**9**

1 about this. What do you say as the attorney for Dan
2 when people ask, "Hey, if you just let this go,
3 everybody will stop talking about it and it'll go
4 away"?
5     JOE TACOPINA: You know what? Dan is quite a
6 courageous individual. He's doing this, not only for
7 himself and his family, but there's a whole host of
8 other people out there, including other owners.
9     I mean, just imagine every time you have a
10 dispute with someone or you want to try to put them
11 in a position of weaken stance or try to get them out
12 of an organization, you spread false rumors.
13     But not rumors, horrifically inaccurate
14 slanderous stories about someone and get it
15 published, and then have that publication be
16 retweeted and reposted on the internet all over the
17 place. And your kids are reading and people are
18 approaching your kids and your wife.
19     And so, you know what? Even if this story--
20 look, and that organization took that article down -
21 that Jeffrey Epstein article - because it's false.
22 It's outrageous. It's defamatory. It's slanderous.

**10**

1 It's criminal. They took it down, but that's not the
2 end of it. Okay? Because now we're at the point now,
3 Dan will not stand by idly as these criminals, for
4 their own malicious reasons, whatever those reasons
5 may be, seek to soil his good name through outrageous
6 lies. It's just not going to happen. I'm not going to
7 let it happen and neither will he.
8     JP FINLAY: All right, so, well, that's clear.
9 It's not going to happen. You're pursuing this thing.
10 The investigation you guys conducted. Is this happen-
11 - I mean, this all happened within the last three
12 weeks or so? Or were you guys digging around on this
13 prior to the Washington Post report?
14     Because the week where the world was waiting
15 for that Post report is when, at least on my end, the
16 amount of rumors started to go crazy. And I'll be
17 honest, I've never even heard of this meaww.com,
18 whatever they're called. I never saw the article, but
19 I know how things spread, especially on, you know,
20 Twitter, Facebook. If something's out there and it
21 starts getting shared, there's a butterfly effect
22 across a lot of mediums.

**11**

1     But it does it not matter that it's some random
2 website that nobody has heard of?
3     JOE TACOPINA: It matters. Of course, it wasn't,
4 you know, the New York Times, the Washington Post or
5 anything like that, NBCSports.com, but it was-- it
6 was a publication that was put out there and that was
7 picked up. And picked up to the point where it
8 reached his home and his children and his wife and
9 his friends and his community.
10     So, I don't care what the name of the
11 publication is. The fact that someone planted a false
12 story-- again, not just a false story, but a
13 horrifically damaging false story about Dan Snyder
14 that couldn't be further from the truth, is something
15 that, you know, we're going to hold them accountable
16 for because, again, these are crimes that were
17 committed. This is not just a--
18     JP FINLAY: Well, and the allegation is that
19 they did this-- they paid their way to do this and
20 they did it as part of a larger conspiracy, right?
21     JOE TACOPINA: Yeah.
22     JP FINLAY: That's heavy duty.

**12**

1     JOE TACOPINA: We have proof that witnesses were
2 offered money - money - to provide negative false
3 information about Dan.
4     JP FINLAY: I'm a journalist and I'm pretty much
5 for sale on about everything. If you want me to start
6 reading ads for your law office on my podcast, I'm
7 available, Joe. But none of us are available for hire
8 to spread falsehoods, right?
9     JOE TACOPINA: Those who are journalists, and
10 there is journalistic integrity and (inaudible)
11 reason, and we have an affidavit also about this
12 company in particular, this Meaww and how they
13 operate. It's, you know, obviously they're in India
14 and they're operating with very different
15 journalistic standards.
16     And you know, the fact that they wrote a
17 horrific article like that, pulled it right down and
18 then came up with some, I mean, almost laughable
19 excuse as to what happened-- errors in reporting. I
20 mean, you know, it's not going to cut it. And we have
21 proof that that company is a disinformation machine
22 is serving hired guns and concealed bitters.

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020

4 (13 to 16)

---

13

1    JP FINLAY: What's your goal with this thing?
2 The goal is not to prosecute in India, right? I
3 imagine you want everything to happen here in the old
4 US of A?
5    JOE TACOPINA: We are-- we did sue that company
6 in India. That's for sure. But, yes, here's our goal,
7 and here's Mr. Snyder and Tanya's goal and the Snyder
8 family and anyone who cares about what's fair and
9 just and right. The goal is to ensure that the full
10 weight of the law comes down heavily on those
11 responsible for these heinous acts. That's the goal,
12 and that's what will happen. And then make sure that
13 people understand, if they even think about doing
14 something as stupid as this, they're going to have
15 hell to pay.
16    JP FINLAY: How did you narrow it down? Is it
17 Mary Ellen Blair? Do I have the name right?
18    JOE TACOPINA: That's one. Yes, that's right.
19    JP FINLAY: How did you zero in on her in such a
20 short time period?
21    JOE TACOPINA: We have a good investigative
22 team. I mean, that's how we did it. But also--

---

14

1    JP FINLAY: Is that your background? Are you an
2 investigative attorney?
3    JOE TACOPINA: Yeah, I'm a former prosecutor.
4 But it's not so much me. We have a team of attorneys.
5 Believe me, I'm the low guy on the totem pole when it
6 comes to the brainpower in this group here and when
7 it comes to the investigative skills of our team.
8 But, you know, we have former law enforcement
9 officials are part of our team who dug.
10    You know, a lot of this was real easy to find
11 because people came to us. People came to Dan and
12 said, you know, "I was approached and here's what
13 they said." And these people were willing to give
14 under oath sworn affidavits under the penalties of
15 perjury that what was said to them was truthful.
16 Other individuals recorded conversations.
17    So, as I said, you know, we sit here pretty
18 confident about where this is going.
19    JP FINLAY: Wow. This is-- I've been covering
20 the Washington Football Team in some capacity for
21 about 8 seasons and you never know what corner you're
22 going to turn next.

---

15

1    One of the critics would point to Dan and say
2 he's been litigious throughout his term as ownership.
3 Even if this is entirely different than things in the
4 past - suing the city paper, suing season
5 ticketholders, whatever - do you think that's a
6 problem for him to be seen as litigious?
7    JOE TACOPINA: Look, I know who he is as a human
8 being, as a person, as an owner, as-- I mean, he's
9 one of the-- he's a great American success story. His
10 team is one of the greatest franchises in sports.
11    And honestly, you know, what he's been
12 litigious about in the past, I've not been involved
13 in, so I really can't speak that. And I honestly
14 don't care about it.
15    What I care about is what happened here and the
16 facts that have been uncovered here are absolutely
17 outrageous. And really, I think anyone with courage
18 and the wherewithal to fight back, would fight back.
19 I've seen emotions-- raw emotions from that family
20 based on things that were written about him that were
21 not true. You know, it bothers me-- troubles me that
22 anyone should have to go through that no matter how

---

16

1 litigious they may be or may not be.
2    But no one asked for this, and no matter what
3 happens in a courtroom where people have legal
4 disputes all the time, you know, you play by the
5 rules. But this is not playing by the rules. If
6 someone's trying to get a tactical advantage by
7 trying to smear him, defame him, slander him, and
8 thinks that somehow that's going to help in a legal
9 proceeding, they're wrong. And that's not how the
10 process works.
11    JP FINLAY: Joe, I got to say, I really
12 appreciate your time. And I want to say this on the
13 record for posterity, I don't want to mess with you,
14 man. I don't want you-- I don't want to be on your
15 bad side.
16    JOE TACOPINA: I'm here for you, JP, if you need
17 me, but I don't think you'll be in that position
18 ever, hopefully.
19    JP FINLAY: I hope not too. Where are you? Are
20 you in New York? Are you DC? Where you based?
21    JOE TACOPINA: New York City. Yes.
22    JP FINLAY: How on earth are you a Canadians fan

---

17

1  if you're in New York?
2      JOE TACOPINA: Grew up playing some junior
3  hockey in Verdun, a suburb of Montreal. Just, you
4  know, before the internet was a thing, and I used to
5  spend a lot of time at The Forum. And you know, if
6  you've been to the Montreal Forum, you'd fall in love
7  real quick. That's a different place. It's the mecca
8  of-- it was the mecca of hockey. And certainly,
9  seeing guys like Guy LaFleur or Ken Dryden and
10  players like that, sort of change your perspective on
11  hockey. So, that's it. Once a Habs fan, always a Habs
12  fan.
13      JP FINLAY: I get that for sure. That's kind of
14  how I stumbled into my line of work, is I loved the
15  Washington Football Team as a kid and saw some really
16  great players, some really teams. Obviously,
17  everybody hopes it can back to that. Do you know Alan
18  May? Played for the Caps, is a broadcaster now.
19      JOE TACOPINA: Yeah. I remember him, yeah.
20      JP FINLAY: You kind of look like him. Like, you
21  give off that tough guy hockey vibe and (inaudible)
22  has the same thing. It's working for you.

19

1        CERTIFICATE OF TRANSCRIBER
2      I, Steph Mistele, do hereby certify that
3  the foregoing transcript is a true and correct record
4  of the recorded proceedings; that said proceedings
5  were transcribed to the best of my ability from the
6  audio recording and supporting information; and that
7  I am neither counsel for, related to, nor employed by
8  any of the parties to this case and have no interest,
9  financial or otherwise, in its outcome.
10
11
12  *Steph Mistele*
13  _____
14  Steph Mistele
15  August 17, 2020
16
17
18
19
20
21
22

18

1      JOE TACOPINA: He's a bit of a tough guy,
2  (inaudible)?
3      JP FINLAY: Indeed. I think still is. I
4  wouldn't-- I wouldn't mess with you, and I wouldn't
5  mess with him. Joe, thank you for your time. I
6  appreciate it, and who knows, maybe we'll speak
7  again.
8      JOE TACOPINA: Okay, guys, anytime. I'm here.
9
10
11      (The recording was concluded.)
12
13
14
15
16
17
18
19
20
21
22

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                    6

| A |
|---|

**a-**
11:17
**ability**
19:5
**about**
2:8, 2:16, 4:7,
5:1, 5:6, 5:9,
6:15, 6:16,
7:13, 8:8, 9:1,
9:3, 9:14,
11:13, 12:3,
12:5, 12:11,
13:8, 13:13,
14:18, 14:21,
15:12, 15:14,
15:15, 15:20
**absolutely**
15:16
**abuse**
2:21
**accountable**
11:15
**across**
10:22
**action**
3:19, 3:20,
4:3, 4:12, 4:13,
4:18, 6:16,
6:17, 6:21, 8:16
**acts**
5:5, 13:11
**actually**
3:2
**ads**
12:6
**advantage**
16:6
**affidavit**
12:11
**affidavits**
7:16, 14:14
**afraid**
5:6
**after**
2:6, 3:3
**again**
8:3, 8:15,

11:12, 11:16,
18:7
**against**
2:5, 4:12
**age**
2:19
**alan**
17:17
**all**
5:8, 6:15,
6:16, 9:16,
10:8, 10:11,
16:4
**allegation**
11:18
**allows**
4:16
**almost**
12:18
**also**
5:18, 12:11
**also-**
13:22
**always**
17:11
**american**
15:9
**amount**
10:16
**anonymity**
4:4
**another**
6:20
**another-**
6:11
**any**
7:22, 8:11,
19:8
**anyone**
6:7, 13:8,
15:17, 15:22
**anything**
8:1, 11:5
**anytime**
18:8
**apply**
8:13
**appreciate**
16:12, 18:6

**approached**
14:12
**approaching**
9:18
**appropriate**
8:7
**are-**
13:5
**around**
10:12
**article**
2:17, 3:1, 3:4,
3:9, 8:21, 9:20,
9:21, 10:18,
12:17
**articles**
4:2, 6:4, 8:9
**as-**
15:8
**ask**
9:2
**asked**
16:2
**associate**
2:20
**attack**
6:2, 7:8
**attempts**
7:12
**attorney**
1:5, 2:4, 9:1,
14:2
**attorneys**
14:4
**audio**
7:17, 19:6
**august**
19:15
**available**
12:7
**away**
9:4

| B |
|---|

**back**
7:16, 7:17,
15:18, 17:17
**background**
14:1

**bad**
2:11, 16:15
**based**
15:20, 16:20
**basically**
7:14
**be-**
6:2
**beautiful**
5:22
**because**
2:10, 4:16,
9:21, 10:2,
10:14, 11:16,
14:11
**been**
14:19, 15:2,
15:11, 15:12,
15:16, 17:6
**before**
2:7, 7:3, 17:4
**behind**
2:15, 3:17,
4:1, 6:7, 6:8,
8:6, 8:17
**being**
15:8
**beliefs**
7:3
**believe**
3:5, 3:17, 4:3,
5:17, 14:5
**best**
19:5
**bidding**
4:10, 6:10
**bit**
18:1
**bitters**
3:7, 12:22
**blair**
4:11, 6:10,
13:17
**born**
3:12
**bothers**
15:21
**brainpower**
14:6

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                                7

**bribe**
5:8, 5:10
**broadcaster**
17:18
**brought**
3:19
**butterfly**
10:21

**C**

**called**
10:18
**calling**
3:14
**came**
2:7, 12:18,
14:11
**can**
2:12, 2:19,
17:17
**can't**
15:13
**can't-**
8:6
**canadians**
16:22
**capacity**
14:20
**caps**
17:18
**captured**
4:22
**care**
11:10, 15:14,
15:15
**cares**
13:8
**case**
8:5, 19:8
**certainly**
17:8
**certificate**
19:1
**certify**
19:2
**change**
17:10
**child**
2:20

**children**
3:16, 5:22,
11:8
**city**
15:4, 16:21
**clear**
10:8
**clients**
4:6
**cloak**
4:4
**club**
7:6
**com**
10:17, 11:5
**come**
6:2, 6:6
**comes**
13:10, 14:6,
14:7
**committed**
11:17
**common**
8:4, 8:13
**community**
6:1, 11:9
**company**
3:5, 3:8, 4:4,
4:5, 12:12,
12:21, 13:5
**complicit**
6:10
**conceal**
3:7
**concealed**
12:22
**concluded**
18:11
**conducted**
10:10
**confident**
14:18
**connection**
8:11
**conspiracy**
11:20
**conversations**
14:16

**corner**
14:21
**corners**
7:1
**correct**
19:3
**corruptive**
3:5
**couldn't**
11:14
**counsel**
19:7
**courage**
15:17
**courageous**
9:6
**course**
3:9, 6:17,
6:21, 11:3
**court**
3:20, 4:12, 7:1
**court's**
4:17
**courtroom**
16:3
**covering**
14:19
**crazy**
5:13, 5:15,
10:16
**crimes**
11:16
**criminal**
5:5, 6:3, 10:1
**criminals**
5:3, 10:3
**critics**
15:1
**cut**
12:20

**D**

**damaging**
11:13
**dan**
1:5, 2:4, 2:22,
7:13, 9:1, 9:5,
10:3, 11:13,

12:3, 14:11,
15:1
**daniel**
5:20
**day**
2:19
**dc**
16:20
**defamation**
2:5, 3:20, 4:19
**defamatory**
9:22
**defame**
6:12, 16:7
**destroy**
6:5
**did**
11:19, 11:20,
13:5, 13:16,
13:19, 13:22
**different**
12:14, 15:3,
17:7
**digging**
10:12
**disgruntled**
4:11, 7:10
**disinformation**
12:21
**dispute**
9:10
**disputes**
16:4
**documentary**
3:21
**does**
7:22, 11:1
**doing**
2:12, 3:18,
4:8, 6:10, 7:15,
9:6, 13:13
**don't**
6:21, 11:10,
15:14, 16:13,
16:14, 16:17
**done**
7:2
**down**
6:6, 9:20,

10:1, 12:17,
13:10, 13:16
**dryden**
17:9
**dug**
14:9
**duty**
11:22

**E**

**earth**
16:22
**easy**
14:10
**effect**
10:21
**elementary**
7:22
**ellen**
4:10, 6:10,
13:17
**emotions**
15:19
**emotions-**
15:19
**employed**
19:7
**employee**
4:11, 7:11
**end**
10:2, 10:15
**enforcement**
14:8
**ensure**
13:9
**entirely**
15:3
**epstein**
2:18, 2:20,
3:14, 9:21
**errors**
12:19
**especially**
10:19
**even**
2:7, 9:19,
10:17, 13:13,
15:3

**ever**
16:18
**every**
9:9
**everybody**
9:3, 17:17
**everything**
12:5, 13:3
**evidence**
3:22, 4:16,
4:21, 6:9, 7:4,
8:5
**evidence-**
3:21
**excuse**
12:19

**F**

**facebook**
10:20
**fact**
3:3, 11:11,
12:16
**facts**
15:16
**fair**
13:8
**fall**
17:6
**false**
2:17, 5:9,
7:12, 9:12,
9:21, 11:11,
11:12, 11:13,
12:2
**falsehoods**
12:8
**falsely**
7:7
**family**
3:15, 6:5, 9:7,
13:8, 15:19
**fan**
16:22, 17:11,
17:12
**federal**
3:20, 4:12,
4:13, 6:22

**fight**
15:18
**filed**
4:11
**filings**
7:1, 7:18
**financial**
19:9
**find**
6:17, 6:21,
14:10
**finlay**
1:9, 2:3, 4:8,
4:13, 4:20,
5:13, 6:14,
6:19, 7:20,
8:21, 10:8,
11:18, 11:22,
12:4, 13:1,
13:16, 13:19,
14:1, 14:19,
16:11, 16:19,
16:22, 17:13,
17:20, 18:3
**first**
8:16
**football**
1:3, 2:9,
14:20, 17:15
**foregoing**
19:3
**foreign**
4:18
**forgive**
7:21
**formal**
7:10
**former**
4:11, 14:3,
14:8
**forum**
17:5, 17:6
**foster**
1:6
**four**
7:1
**franchises**
15:10

**fraud**
5:11
**free**
8:11
**friends**
11:9
**from**
4:5, 11:14,
15:19, 19:5
**front**
4:10
**full**
13:9
**further**
11:14

**G**

**get**
6:8, 7:12,
8:19, 9:11,
9:14, 16:6,
17:13
**gets**
2:11
**getting**
10:21
**give**
8:8, 14:13,
17:21
**go**
9:2, 9:3,
10:16, 15:22
**goal**
13:1, 13:2,
13:6, 13:7,
13:9, 13:11
**going**
2:10, 7:5, 7:8,
7:20, 8:13,
10:6, 10:9,
11:15, 12:20,
13:14, 14:18,
14:22, 16:8
**good**
5:4, 10:5,
13:21
**got**
4:2, 16:11

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                        9

| | | | |
|---|---|---|---|
| **granted** | 4:5, 7:11, 8:18, | **higher** | 16:9, 16:22, |
| 5:20 | 11:2, 17:22 | 3:6 | 17:14 |
| **great** | **have** | **him** | **human** |
| 15:9, 17:16 | 3:8, 3:15, | 2:17, 3:1, | 15:7 |
| **greatest** | 4:14, 5:22, 6:3, | 15:6, 15:20, | **hurt** |
| 15:10 | 6:9, 7:1, 7:3, | 16:7, 17:19, | 6:5 |
| **grew** | 7:4, 7:7, 7:16, | 17:20, 18:5 | **I** |
| 17:2 | 7:17, 8:1, 9:9, | **himself** | **i'll** |
| **gritty** | 9:15, 12:1, | 9:7 | 6:6, 10:16 |
| 2:11 | 12:11, 12:20, | **hire** | **i've** |
| **group** | 13:14, 13:17, | 12:7 | 5:18, 10:17, |
| 14:6 | 13:21, 14:4, | **hired** | 14:19, 15:12, |
| **gun** | 14:8, 15:16, | 12:22 | 15:19 |
| 3:6 | 15:22, 16:3, | **his** | **identified** |
| **guns** | 19:8 | 5:4, 5:21, 9:7, | 8:18 |
| 12:22 | **have-** | 10:5, 11:8, | **idly** |
| **guy** | 6:13, 6:18 | 11:9, 15:2, 15:9 | 5:3, 6:6, 10:3 |
| 14:5, 17:9, | **he's** | **hit** | **imagine** |
| 17:21, 18:1 | 5:21, 9:6, | 3:2 | 9:9, 13:3 |
| **guys** | 15:2, 15:8, | **hockey** | **inaccurate** |
| 10:10, 10:12, | 15:9, 15:11, | 17:3, 17:8, | 9:13 |
| 17:9, 18:8 | 18:1 | 17:11, 17:21 | **including** |
| **H** | **heard** | **hold** | 2:17, 9:8 |
| **habs** | 10:17, 11:2 | 11:15 | **indeed** |
| 17:11 | **heavily** | **home** | 18:3 |
| **had** | 13:10 | 11:8 | **india** |
| 3:1, 3:18, 5:17 | **heavy** | **honest** | 3:8, 4:5, 4:19, |
| **hadn't** | 11:22 | 10:17 | 12:13, 13:2, |
| 5:16 | **heinous** | **honestly** | 13:6 |
| **hammer** | 13:11 | 5:15, 15:11, | **individual** |
| 6:7 | **hell** | 15:13 | 2:19, 5:9, |
| **happen** | 13:15 | **hope** | 6:12, 7:10, |
| 10:6, 10:7, | **help** | 6:20, 16:19 | 8:18, 9:6 |
| 10:9, 10:10, | 16:8 | **hopefully** | **individuals** |
| 13:3, 13:12 | **her** | 16:18 | 7:12, 14:16 |
| **happened** | 8:19, 13:19 | **hopes** | **information** |
| 10:11, 15:15 | **here** | 17:17 | 3:6, 7:13, |
| **happened-** | 4:22, 7:21, | **horrific** | 8:17, 12:3, 19:6 |
| 12:19 | 13:3, 14:6, | 2:15, 2:16, | **inside** |
| **happens** | 14:17, 15:15, | 12:17 | 2:8 |
| 16:3 | 15:16, 16:16, | **horrifically** | **instance** |
| **harassment** | 18:8 | 9:13, 11:13 | 4:19 |
| 2:8 | **here's** | **host** | **integrity** |
| **hard** | 13:6, 13:7, | 9:7 | 12:10 |
| 5:17 | 14:12 | **how** | **intended** |
| **has** | **hereby** | 10:19, 12:12, | 6:4 |
| 2:22, 3:16, | 19:2 | 13:16, 13:19, | **intent** |
| | **hey** | 13:22, 15:22, | 6:3 |
| | 9:2 | | |

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                              10

**interest**
19:8
**internet**
3:2, 9:16, 17:4
**interview**
1:9
**interviews**
1:4
**into**
2:11, 17:14
**investigated**
5:16
**investigation**
7:2, 10:10
**investigative**
13:21, 14:2,
14:7
**involved**
15:12
**is-**
8:15, 14:19
**it'd**
5:17
**it'll**
9:3
**it's**
4:15, 5:18,
8:22, 9:21,
9:22, 10:1,
10:6, 10:9,
11:1, 12:13,
12:20, 14:4,
17:7, 17:22
**its**
3:2, 19:9

**J**

**jeffrey**
2:18, 2:20,
3:14, 9:21
**job**
1:20
**joe**
2:4, 2:10,
2:14, 4:9, 4:15,
4:21, 5:15,
6:15, 6:20, 8:3,
9:5, 11:3,

11:21, 12:1,
12:7, 12:9,
13:5, 13:18,
13:21, 14:3,
15:7, 16:11,
16:16, 16:21,
17:2, 17:19,
18:1, 18:5, 18:8
**joseph**
1:9
**journalist**
8:11, 12:4
**journalistic**
12:10, 12:15
**journalists**
12:9
**jp**
1:9, 2:3, 4:8,
4:13, 4:20,
5:13, 6:14,
6:19, 7:20,
8:21, 10:8,
11:18, 11:22,
12:4, 13:1,
13:16, 13:19,
14:1, 14:19,
16:11, 16:16,
16:19, 16:22,
17:13, 17:20,
18:3
**junior**
17:2
**just**
8:6, 9:2, 9:9,
10:6, 11:12,
11:17, 13:9,
17:3

**K**

**ken**
17:9
**kid**
17:15
**kids**
9:17, 9:18
**kind**
5:13, 7:22,
8:22, 17:13,

17:20
**know**
2:22, 3:11,
3:15, 4:9, 5:2,
5:16, 5:19,
6:13, 6:18, 7:5,
7:9, 7:18, 8:3,
8:9, 8:11, 8:12,
8:21, 9:5, 9:19,
10:19, 11:4,
11:15, 12:13,
12:16, 12:20,
14:8, 14:10,
14:12, 14:17,
14:21, 15:7,
15:11, 15:21,
16:4, 17:4,
17:5, 17:17
**know-**
6:9
**knows**
18:6

**L**

**lafleur**
17:9
**larger**
11:20
**last**
10:11
**laughable**
12:18
**law**
12:6, 13:10,
14:8
**lawsuit**
3:20
**lawsuits**
2:5
**least**
6:11, 10:15
**legal**
2:11, 3:19,
4:3, 6:7, 7:21,
8:16, 16:3, 16:8
**let**
9:2, 10:7
**level-**
5:18

**lies**
10:6
**like**
3:13, 6:7,
11:5, 12:17,
17:9, 17:10,
17:20
**line**
17:14
**linked**
2:17
**linking**
3:14
**litigation**
2:5
**litigious**
15:2, 15:6,
15:12, 16:1
**look**
6:21, 9:20,
15:7, 17:20
**looking**
8:19
**lot**
6:1, 7:5, 7:20,
10:22, 14:10,
17:5
**love**
17:6
**loved**
17:14
**low**
14:5

**M**

**machine**
3:6, 12:21
**made**
3:2
**major**
7:20
**make**
5:6, 8:10,
13:12
**making**
7:18
**malicious**
5:4, 10:4

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                11

man
16:14
mary
4:10, 6:9,
13:17
matter
11:1, 15:22,
16:2
matters
2:12, 11:3
may
7:7, 10:5,
16:1, 17:18
maybe
2:7, 2:12, 18:6
mclaurin
1:5
me-
15:21
mean
2:14, 2:18,
3:10, 4:13,
5:14, 8:21, 9:9,
10:11, 12:18,
12:20, 13:22,
15:8
meaww
4:4, 10:17,
12:12
mecca
17:7, 17:8
media
3:3, 4:5, 7:13
mediums
10:22
mess
16:13, 18:4,
18:5
mince
5:6
mind
7:21
mistake
3:12, 3:13, 5:6
mistakes
3:10, 3:11
mistele
1:22, 19:2,

19:14
money
5:8, 5:10,
5:11, 7:14, 12:2
montreal
17:3, 17:6
motive
6:4
motives
7:7
much
12:4, 14:4

**N**

name
5:4, 10:5,
11:10, 13:17
narrow
13:16
nbcsports
11:5
need
16:16
nefarious
4:6
negative
12:2
neither
10:7, 19:7
never
10:17, 10:18,
14:21
new
8:22, 11:4,
16:20, 16:21,
17:1
next
6:19, 14:22
nitty
2:11
nobody
11:2
none
12:7
nor
19:7
not
3:13, 3:19,

5:3, 5:6, 7:8,
7:21, 8:13, 9:6,
9:13, 10:1,
10:3, 10:6,
10:9, 11:1,
11:12, 11:17,
12:20, 13:2,
14:4, 15:12,
15:21, 16:1,
16:5, 16:9,
16:19
not-
3:11
nothing
2:22, 3:1
now
7:6, 10:2,
17:18

**O**

oath
8:20, 14:14
obviously
3:17, 7:2,
12:13, 17:16
of-
17:8
off
17:21
offer
5:10, 7:14
offered
12:2
office
12:6
officials
14:9
oh
3:9
okay
2:3, 4:20,
10:2, 18:8
old
13:3
once
17:11
one
2:20, 6:11,

7:10, 8:17,
13:18, 15:1,
15:9, 15:10,
16:2
one's
6:5
only
3:19, 9:6
operate
12:13
operating
12:14
opine
7:4
opinion
8:8
opinions
7:3
opposed
3:12
organization
2:9, 9:12, 9:20
other
6:11, 9:8,
14:16
others
8:19
otherwise
19:9
our
6:22, 7:19,
13:6, 14:7, 14:9
out
2:8, 3:4, 6:17,
6:21, 8:4, 9:8,
9:11, 10:20,
11:6
outcome
19:9
outrageous
9:22, 10:5,
15:17
outstanding
1:4
over
9:16
own
3:18, 5:3, 7:3,

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020
12

| | | | |
|---|---|---|---|

10:4
**owner**
15:8
**owners**
9:8
**ownership**
15:2

**P**

**pages**
1:21
**paid**
11:19
**paper**
15:4
**part**
11:20, 14:9
**particular**
12:12
**parties**
19:8
**past**
15:4, 15:12
**pay**
13:15
**pedophile**
3:15
**pedophilia**
2:21
**penalties**
14:14
**people**
2:15, 3:17,
5:8, 5:10, 5:22,
6:3, 7:7, 8:18,
9:2, 9:8, 9:17,
13:13, 14:11,
14:13, 16:3
**perhaps**
2:18
**period**
13:20
**perjury**
14:15
**permission**
4:17
**perpetrate**
5:11

**person**
4:9, 5:21, 15:8
**perspective**
17:10
**philanthropic**
6:2
**picked**
11:7
**pierce**
4:3
**place**
9:17, 17:7
**plant**
6:4
**planted**
11:11
**play**
8:4, 16:4
**played**
17:18
**players**
17:10, 17:16
**playing**
16:5, 17:2
**pleased**
2:3
**plus**
1:6
**pocket**
6:11
**podcast**
1:9, 12:6
**point**
5:2, 10:2,
11:7, 15:1
**pole**
14:5
**position**
9:11, 16:17
**post**
2:7, 10:13,
10:15, 11:4
**post-**
2:6
**poster**
2:20
**posterity**
16:13

**present**
5:9, 8:5
**pretty**
12:4, 14:17
**printed**
4:2
**prior**
10:13
**problem**
15:6
**proceeding**
16:9
**proceedings**
19:4
**process**
16:10
**produced**
4:16
**proof**
7:19, 12:1,
12:21
**prosecute**
13:2
**prosecutor**
14:3
**protect**
4:5
**provide**
7:12, 12:2
**publication**
9:15, 11:6,
11:11
**publications**
8:10
**published**
9:15
**pulled**
12:17
**pulling**
4:1
**purpose**
8:15
**purposes**
3:18, 6:22
**pursuing**
2:14, 10:9
**put**
3:4, 9:10, 11:6

**Q**

**question**
6:19
**questions**
7:22
**quick**
17:7
**quite**
9:5

**R**

**random**
11:1
**raw**
15:19
**reached**
11:8
**read**
8:9
**reading**
9:17, 12:6
**real**
5:20, 14:10,
17:7
**really**
2:15, 3:22,
5:2, 6:5, 15:13,
15:17, 16:11,
17:15, 17:16
**really-**
5:18
**reason**
12:11
**reasons**
5:4, 10:4
**record**
16:13, 19:3
**recorded**
14:16, 19:4
**recording**
18:11, 19:6
**recordings**
7:17
**regarding**
7:6
**related**
19:7

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                    13

| | | | |
|---|---|---|---|
| **remember** | **say** | **slander** | **sounds** |
| 17:19 | 9:1, 15:1, | 16:7 | 5:13, 5:14 |
| **removed** | 16:11, 16:12 | **slanderous** | **speak** |
| 3:9 | **saying** | 9:14, 9:22 | 7:13, 15:13, |
| **remunerate** | 3:11 | **smear** | 18:6 |
| 7:14 | **scenes** | 16:7 | **speaking** |
| **report** | 4:1 | **snyder** | 8:18 |
| 2:7, 10:13, | **scott** | 2:4, 2:13, | **specifically** |
| 10:15 | 1:4 | 2:16, 2:22, 5:2, | 8:22 |
| **reporting** | **season** | 6:12, 7:8, 7:13, | **speculate** |
| 3:10, 3:11, | 15:4 | 11:13, 13:7 | 6:22, 7:8, 8:7 |
| 3:13, 12:19 | **seasons** | **snyder's** | **spend** |
| **reposted** | 14:21 | 1:5, 5:20 | 17:5 |
| 9:16 | **see** | **so-** | **spoken** |
| **reputation** | 8:19 | 4:19 | 7:11 |
| 6:5 | **seeing** | **social** | **sports** |
| **responsible** | 17:9 | 3:3 | 15:10 |
| 13:11 | **seek** | **soil** | **spread** |
| **retweeted** | 5:4, 10:5 | 5:4, 10:5 | 2:6, 9:12, |
| 9:16 | **seeking** | **solid** | 10:19, 12:8 |
| **reuben** | 3:21 | 7:4, 7:19 | **stance** |
| 1:6 | **seen** | **some** | 9:11 |
| **right** | 5:19, 15:6, | 2:5, 3:10, | **stand** |
| 5:14, 7:6, | 15:19 | 4:10, 7:7, 8:9, | 5:3, 6:6, 10:3 |
| 10:8, 11:20, | **sense** | 8:20, 11:1, | **standards** |
| 12:8, 12:17, | 8:4, 8:13 | 12:18, 14:20, | 12:15 |
| 13:2, 13:9, | **series** | 17:2, 17:15, | **start** |
| 13:17, 13:18 | 2:16 | 17:16 | 12:5 |
| **rock** | **serving** | **somehow** | **started** |
| 7:4, 7:19 | 3:6, 12:22 | 16:8 | 10:16 |
| **rounds** | **sexual** | **someone** | **starts** |
| 3:2 | 2:8, 2:21 | 3:14, 3:15, | 10:21 |
| **rules** | **shared** | 9:10, 9:14, | **states** |
| 16:5 | 10:21 | 11:11 | 3:21, 4:18, |
| **rumors** | **short** | **someone's** | 4:22 |
| 2:6, 9:12, | 13:20 | 16:6 | **stay** |
| 9:13, 10:16 | **should** | **something** | 7:1 |
| | 15:22 | 4:14, 5:19, | **step** |
| **S** | **side** | 6:6, 11:14, | 8:16 |
| **said** | 16:15 | 13:14 | **steph** |
| 3:9, 14:12, | **signature-hekcn** | **something's** | 1:22, 19:2, |
| 14:13, 14:15, | 19:12 | 10:20 | 19:14 |
| 14:17, 19:4 | **since** | **sort** | **still** |
| **sale** | 3:9 | 3:5, 4:15, | 18:3 |
| 8:2, 12:5 | **sit** | 5:19, 8:4, 8:10, | **stop** |
| **same** | 14:17 | 17:10 | 2:10, 9:3 |
| 17:22 | **skills** | **sorts** | **stories** |
| **saw** | 14:7 | 7:15 | 2:17, 5:9, 9:14 |
| 10:18, 17:15 | | | |

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                    14

stories-
2:16
story
2:15, 11:12,
11:13, 15:9
story-
9:19, 11:12
strings
4:1
strong
6:9
stumbled
17:14
stupid
13:14
suburb
17:3
success
15:9
such
13:19
sue
13:5
sued
3:8, 4:19
suing
15:4
supporting
19:6
sure
2:14, 13:6,
13:12, 17:13
sworn
3:22, 7:16,
14:14

**T**

tacopina
1:9, 2:4, 2:14,
4:9, 4:15, 4:21,
5:15, 6:15,
6:20, 8:3, 9:5,
11:3, 11:21,
12:1, 12:9,
13:5, 13:18,
13:21, 14:3,
15:7, 16:16,
16:21, 17:2,

17:19, 18:1,
18:8
tactical
16:6
take
5:20, 8:20
taken
4:17
talk
1:3, 2:10
talking
9:3
tanya
5:21
tanya's
13:7
tape
7:17
team
2:9, 8:1,
13:22, 14:4,
14:7, 14:9,
14:20, 15:10,
17:15
teams
17:16
tell
2:12, 4:14
term
15:2
terrific
5:22
terrific-
5:21
terry
1:5
testimony
3:22, 4:17,
8:20
than
15:3
thank
18:5
that
2:6, 2:17, 3:4,
3:5, 3:8, 3:18,
3:19, 4:1, 4:4,
4:9, 4:21, 5:11,

5:19, 6:4, 6:6,
6:9, 7:2, 7:10,
7:16, 7:17,
8:10, 8:12,
8:14, 9:15,
9:20, 9:21,
10:15, 11:1,
11:2, 11:5,
11:6, 11:11,
11:14, 11:15,
11:16, 11:18,
12:1, 12:16,
12:17, 12:21,
12:22, 13:5,
13:9, 13:12,
14:1, 14:15,
15:13, 15:16,
15:19, 15:20,
15:21, 15:22,
16:8, 16:17,
17:10, 17:13,
17:17, 17:21,
19:2, 19:4, 19:6
that's
3:10, 3:12,
4:7, 4:22, 5:1,
5:5, 5:9, 5:11,
6:20, 8:2, 8:11,
10:1, 10:8,
11:22, 13:6,
13:11, 13:12,
13:18, 13:22,
15:5, 16:8,
16:9, 17:7,
17:11, 17:13
the-
15:9
their
3:18, 5:3, 6:1,
10:4, 11:19
them
7:12, 7:14,
7:15, 9:10,
9:11, 11:15,
14:15
then
9:15, 12:18,
13:12

there
3:10, 7:6,
8:21, 9:8,
10:20, 11:6,
12:10
there's
3:17, 7:5,
7:20, 8:3, 8:4,
9:7, 10:21
there's-
5:12
these
4:2, 5:5, 7:15,
7:18, 10:3,
11:16, 13:11,
14:13
they
3:9, 4:14,
5:22, 6:1, 7:9,
8:13, 10:1,
11:19, 11:20,
12:12, 12:16,
13:13, 14:13,
16:1
they're
8:12, 10:18,
12:13, 12:14,
13:14, 16:9
they've
3:8
thing
2:18, 4:15,
6:20, 10:9,
13:1, 17:4,
17:22
things
6:2, 7:5, 7:15,
10:19, 15:3,
15:20
think
4:8, 5:20, 8:4,
8:5, 8:12,
13:13, 15:5,
15:17, 16:17,
18:3
thinks
16:8
this
2:15, 2:19,

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                                    15

3:16, 3:19, 4:4,
4:7, 4:10, 4:18,
5:2, 5:13, 5:14,
6:7, 6:8, 6:15,
6:17, 6:21,
7:10, 7:20, 8:1,
8:5, 8:6, 8:8,
8:14, 8:15,
8:16, 8:17, 9:1,
9:2, 9:6, 9:19,
10:9, 10:10,
10:11, 10:12,
10:17, 11:17,
11:19, 12:11,
12:12, 13:1,
13:14, 14:6,
14:10, 14:18,
14:19, 15:3,
16:2, 16:5,
16:12, 19:8
**this-**
11:19
**thoroughly**
5:16
**those**
5:7, 10:4,
12:9, 13:10
**three**
1:4, 5:22,
10:11
**through**
6:17, 10:5,
15:22
**throughout**
15:2
**ticketholders**
15:5
**time**
8:14, 9:9,
13:20, 16:4,
16:12, 17:5,
18:5
**times**
8:22, 11:4
**today**
8:9
**too**
16:19

**took**
9:20, 10:1
**totem**
14:5
**tough**
17:21, 18:1
**transcribed**
1:22, 19:5
**transcriber**
19:1
**transcript**
19:3
**troubles**
15:21
**true**
15:21, 19:3
**truth**
4:14, 11:14
**truthful**
14:15
**try**
8:16, 9:10,
9:11
**trying**
2:10, 6:12,
16:6, 16:7
**turn**
14:22
**turner**
1:4
**twitter**
10:20

**U**

**uncover**
3:22, 4:21,
8:16
**uncovered**
15:16
**under**
6:2, 8:19,
14:14
**understand**
13:13
**unique**
4:15
**united**
3:21, 4:18,

4:22
**used**
4:5, 17:4
**using**
8:12

**V**

**various**
7:11, 8:10
**verdun**
17:3
**very**
2:3, 12:14
**vibe**
17:21

**W**

**waiting**
10:14
**want**
6:22, 7:4,
8:13, 9:10,
12:5, 13:3,
16:12, 16:13,
16:14
**was**
3:4, 3:10,
3:12, 4:10,
4:22, 6:10,
6:16, 8:21,
10:14, 11:6,
14:10, 14:12,
14:15, 17:4,
17:8, 18:11
**was-**
11:5
**washington**
1:3, 2:6, 2:7,
2:8, 7:6, 10:13,
11:4, 14:20,
17:15
**wasn't**
11:3
**way**
11:19
**we'll**
8:19, 18:6
**we're**
2:14, 8:19,

10:2, 11:15
**we've**
7:2
**weaken**
9:11
**website**
11:2
**week**
10:14
**weeks**
10:12
**weight**
13:10
**welcome**
2:3
**well**
4:9, 10:8,
11:18
**were**
2:6, 2:15, 5:5,
10:12, 11:16,
12:1, 14:13,
15:20, 19:5
**weren't**
7:19
**what**
2:12, 4:7,
4:13, 5:1, 5:5,
6:15, 6:16, 7:9,
8:8, 9:1, 9:5,
9:19, 11:10,
12:19, 13:12,
14:12, 14:15,
14:21, 15:11,
15:15, 16:2
**what's**
13:1, 13:8
**whatever**
8:12, 10:4,
10:18, 15:5
**when**
2:11, 3:15,
5:8, 5:10, 5:12,
8:18, 9:2,
10:15, 14:5,
14:6
**where**
10:14, 11:7,

Transcript of Podcast Excerpt - Interview of Joseph Tacopina
Conducted on August 14, 2020                           16

14:18, 16:3,
16:19, 16:20
**wherewithal**
15:18
**who**
2:4, 2:15,
3:16, 3:18, 4:8,
4:11, 6:3, 6:14,
6:15, 6:16,
6:17, 7:7, 7:9,
12:9, 13:8,
14:9, 15:7, 18:6
**who's**
3:22, 4:1, 6:7,
6:8, 8:6, 8:17
**whole**
9:7
**why**
6:19
**wife**
3:16, 5:21,
9:18, 11:8
**wild**
2:5
**will**
4:3, 4:21, 5:3,
6:8, 6:16, 8:4,
8:5, 9:3, 10:3,
10:7, 13:12
**willing**
14:13
**wire**
5:10, 5:11
**with**
1:4, 2:20,
2:22, 3:1, 4:17,
8:1, 8:6, 9:10,
12:14, 12:18,
13:1, 15:17,
16:13, 18:4,
18:5
**within**
7:1, 10:11
**witnesses**
12:1
**witnesses-**
7:11
**won't**
6:6, 8:6

**words**
5:7
**work**
17:14
**working**
17:22
**works**
16:10
**world**
10:14
**worst**
2:18
**would**
15:1, 15:18
**wouldn't**
8:7, 18:4
**wouldn't-**
18:4
**wouldn't**
7:18
**wow**
14:19
**written**
15:20
**wrong**
16:9
**wrote**
12:16

--- Y ---

**yeah**
11:21, 14:3,
17:19
**yes**
13:6, 13:18,
16:21
**yet**
3:1
**york**
8:22, 11:4,
16:20, 16:21,
17:1
**you**
2:12, 2:19,
2:22, 3:11,
3:15, 4:8, 5:2,
5:15, 5:18,
5:19, 6:13,

6:18, 7:5, 7:18,
8:3, 8:9, 8:11,
8:12, 9:1, 9:2,
9:5, 9:9, 9:10,
9:12, 9:19,
10:10, 10:12,
10:19, 11:4,
11:15, 12:5,
12:13, 12:16,
12:20, 13:3,
13:16, 13:19,
14:1, 14:8,
14:10, 14:12,
14:17, 14:21,
15:5, 15:11,
15:21, 16:4,
16:13, 16:16,
16:19, 16:20,
16:22, 17:3,
17:5, 17:17,
17:20, 17:22,
18:4, 18:5
**you'd**
17:6
**you'll**
16:17
**you're**
2:12, 10:9,
14:21, 17:1
**you've**
17:6
**you-**
16:14
**your**
9:17, 9:18,
12:6, 13:1,
14:1, 16:12,
16:14, 17:10,
18:5

--- Z ---

**zero**
13:19

--- 1 ---

**17**
19:15
**1782**
3:20, 4:12,

4:13, 6:16
**19**
1:21

--- 2 ---

**2020**
19:15

--- 3 ---

**315770**
1:20

--- 4 ---

**40**
8:1

--- 6 ---

**65**
3:12
**66**
3:12

# Exhibit 2

# The Washington Post

*Democracy Dies in Darkness*

# Daniel Snyder, in legal filing, accuses former team employee of spreading false stories

By **Will Hobson**

August 10, 2020 at 6:06 p.m. EDT



Washington NFL owner Daniel Snyder accused a former team employee in a federal court filing Monday of taking part in what he says is an Internet misinformation campaign involving stories that falsely linked him to convicted sex criminal Jeffrey Epstein and Twitter bots that spread unfounded rumors of Snyder abusing drugs, holding "sex parties" and bribing NFL referees.

The filing, a request for discovery in federal district court in Alexandria, accuses Mary Ellen Blair, a former executive assistant to Snyder, of acting as an intermediary for unnamed adversaries Snyder thinks paid an India-based online news company to publish false stories linking him to Epstein.

"We know someone's behind these slanderous and, quite frankly, despicable articles that were published," said Joe Tacopina, an attorney for Snyder, in an interview Monday. "We need to understand who's behind this with certainty. … We want our proof."

Blair's attorney, Lisa J. Banks, released a statement denying her client had involvement with the Epstein stories and accused Snyder of seeking to "humiliate and intimidate" his former employee.

"This filing is an obvious and inappropriate attempt to silence Ms. Blair and others who may wish to communicate with legitimate news organizations about the culture of sexism, harassment and abuse that has existed at the highest levels of the Washington Football team for decades," Banks said. "Bullying and baselessly disparaging former employees who provide truthful information about their experience with Dan Snyder and his organization will do nothing to repair the reputation he claims in this filing to care so deeply about."

Snyder's filing seeks documents from Blair as well as from Comstock Holding Companies, a Virginia real estate company that owns rental properties where Blair has lived. The filing alleges Blair received discounted rent for years while working for the same unidentified people who funded what Snyder believes is an orchestrated "fake news" Internet campaign against him.

Monday's filing appears to mark an intensification in an ongoing dispute between Snyder and three minority owners of the team over the franchise's direction. While his name is not mentioned in the filing, Dwight Schar, one of those minority owners seeking to sell his share of the team, is the father-in-law of Comstock chief executive Christopher Clemente. Schar's daughter, Tracy Schar, is a senior vice president at Comstock and sits on the company's board of directors.

Dwight Schar could not be reached to comment. A spokeswoman for Tracy Schar released a statement denying

Snyder's allegations and said Blair paid the market rate for apartments she has lived in at two Comstock properties since 2015.

"Any insinuation that Ms. Blair has received special treatment for any reason is patently false," wrote Denise Pattakos, a spokeswoman for Tracy Schar. "Any allegations or disparagement of Comstock is just spin designed to deflect from public reports of extremely disturbing behavior overseen by Mr. Snyder in his tenure as the majority owner of the Washington Football Team."

Tacopina declined to answer when asked whether Dwight Schar is one of the people he believes financed the alleged online false information campaign.

"We want to be able to depose Mary Ellen Blair, and get documents … before we go mentioning anyone by name. … But it's just a matter of time before this house of cards comes down," he said.

Monday's filing is connected to a lawsuit Snyder filed last week in Indian court against Media Entertainment Arts WorldWide, the parent company for the website that published the articles linking Snyder to Epstein.

"MEAWW intentionally sows disinformation at the behest of its undisclosed clients, including governments and intelligence services, and often is hired by clients that are cloaked behind several layers of anonymous corporate entities," Snyder's lawyers alleged in Monday's filing.

Last week, MEAWW officials acknowledged, in public statements, factual problems with the stories they published about Snyder but denied that outsiders had paid for their placement. On Monday night, MEAWW editor in chief Dean Williams reiterated his denial of Snyder's allegations.

"MEAWW still stands by its earlier statement that we have never taken money from any person or entities to publish a story," Williams wrote.

MEAWW has taken down the two stories, one of which was headlined "Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list.' " The other was headlined, "RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'?"

In Monday's filing, Snyder's lawyers also suggest the Indian company may have had a role in rumors spread on Twitter in July about a Washington Post story in the days before it was published.

"According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him … Snyder and [former coach Jay] Gruden would hold sex parties with rampant drug usage and some sexual assaults[.] Snyder held nude photoshoots with the Redskins cheerleaders[.] Lawyers are already involved[.]," read one sample tweet, quoted in the court filing.

The Post story, published July 16, contained none of these allegations and instead focused on accusations of sexual harassment and verbal abuse by 15 former female team employees against several former top team executives. None of the women accused Snyder of sexual harassment.

Blair, the former assistant to Snyder, also mentioned The Post in conversations with current team employees, the court filing alleges. Blair had advance knowledge of a July 5 article that disclosed Schar and other minority owners were seeking to sell their stakes in the team and were "not happy being a partner" of Snyder, according to multiple people familiar with the deliberations.

On July 7, according to the filing, Blair told a team employee that they could "probably make a lot of money" for damaging information about Snyder. The next day, according to the filing, Blair told another team employee that an upcoming Post story would focus on how Snyder does "dirty" and "illegal" things. Tacopina, Snyder's attorney, said he has recordings and sworn affidavits from current team employees supporting these allegations.

Blair worked for Washington's NFL team from 2013 to 2017 as an executive assistant, the filing states, and was fired. The filing characterizes her as "disgruntled."

*Liz Clarke contributed to this report.*

**Read more on football:**

Deion Sanders warns players choosing to opt out: The game will go on without you

NFL player DeAndre Baker charged in Florida robbery case; Quinton Dunbar not charged

Tom Brady says Bucs have 'a lot of work to do in a very short amount of time'

# Exhibit 3

**The New York Times** | https://nyti.ms/2XL6xU1

# Washington N.F.L. Team Owner Files Claims Hinting at a Conspiracy

Daniel Snyder is seeking documents from a former employee to bolster his case asserting a campaign to damage him is being waged as shareholders seek to sell their stake in the team.

 

**By Ken Belson and Katherine Rosman**

Published Aug. 10, 2020    Updated Aug. 12, 2020

Daniel Snyder, the owner of the Washington Football Team, has accused a disgruntled former team employee of taking money and assisting in a campaign to spread damaging information against him, his latest effort to fight back attacks on his ownership of the N.F.L. club.

In a filing on Monday in Federal District Court in Alexandria, Va., Snyder asked for access to documents that the former employee, Mary-Ellen Blair, who was an executive assistant in the front office, has, including confidential team records, that might bolster his defamation case against an Indian media company that he contends published defamatory rumors about him.

"We are aggressively pursuing Mary-Ellen Blair, a disgruntled former employee who is clearly in the pocket of another and complicit in this scheme to defame Mr. Snyder, in order to ensure that the full weight of the law comes down heavily on all those responsible for these heinous acts," one of Snyder's lawyers, Joe Tacopina, said in a statement.

The filing, known as a request for discovery, was made three days after Snyder filed a defamation lawsuit in New Delhi against Media Entertainment Arts WorldWide, whose parent company is in India. Media Entertainment Arts WorldWide published articles on its website in July that Snyder considered slanderous and that have since been taken down. Snyder accused the company of accepting money to publish the articles. He wants to identify who paid for them.

Nirnay Chowdhary, a founder of M.E.A. WorldWide, admitted errors were made in the publication of the articles, but he denied that his company accepted money in exchange for their publication.

The case comes amid a growing battle between Snyder and three of his largest minority shareholders, who have been seeking to sell their stakes, which amount to roughly 40 percent of the team. The minority shareholders, including Frederick W. Smith, the chairman of FedEx, hired an investment banker to broker a sale. Snyder has shown no interest in selling his majority stake in the team, which he has owned since 1999.

While Snyder pursues the source of the articles, he has also hired an investigator to look into accusations, detailed in a Washington Post report, of widespread sexual harassment in the team's front office, which he has not denied. In July, he agreed to drop the team's name and logo after many years of protests by Native American groups and others who considered it racist. Snyder was pressured by several sponsors, most notably FedEx, which threatened to sever its multimillion-dollar stadium naming rights deal if the team name was not changed.

According to the filing on Monday, Blair, starting in late May or early June, started reaching out to current and former team employees seeking information that would discredit the team owner. In July, she called someone that the filing describes as a team employee who works daily with Snyder and said the person could "probably make a lot of money" by providing damaging information about Snyder, the filing said.

Reached briefly by phone on Monday, Blair said she was unaware of the filing. "That's funny," she said when told of some of the details included in it. She didn't respond to further request for comment.

In an emailed statement, Lisa J. Banks, Blair's lawyer, said that Snyder's naming of her in the filing is "an obvious and inappropriate attempt to silence Ms. Blair and others who may wish to communicate with legitimate news organizations about the culture of sexism, harassment and abuse that has existed at the highest levels of the Washington Football Team."

The filing also said Blair told a personal employee of Snyder's and two other team employees that "she was in contact with and working in coordination with a third party" and that she and that third party were involved in preparing articles that were going to be damaging to Snyder. The third party, she told them, was not a journalist, but was "well known to each of the involved persons."

According to the filing, Blair also told a team employee who has frequent contact with Snyder that she had been told by someone not employed by The Washington Post, but well known to this employee, that an article would be published in the newspaper in approximately a week that would not be "good for Dan." This was weeks before rumors about the subject of the article began circulating on social media.

Case 1:20-mc-00023-TCB Document 6-3 Filed 08/21/20 Page 3 of 3 PageID# 158

According to the filing, Blair also told a "longtime personal employee" of Snyder's before the social media whispering about the publication of damaging stories that "something big was going to happen." Blair also told this employee that "several of the team's minority owners did not want to do business" with Snyder any longer.

In the filing, Snyder said Blair left the team on bad terms and "has since admitted to having absconded with confidential information" belonging to the team. The filing also describes what it says are Blair's financial difficulties and says that while she worked for the team, her wages were garnished.

Snyder contended that she has an unidentified "financial benefactor" who has provided discounted rent in luxury apartment buildings in Virginia that are connected to a minority shareholder who is seeking to sell his stake.

Tracy Schar, the daughter of Dwight Schar, one of the team's minority shareholders seeking to sell, is senior vice president for marketing and brand management at Comstock Holding Companies, the real estate development company that manages the building where Blair lives. Two other members of Comstock's board worked for Red Zone Capital, which is co-owned by Dwight Schar and Snyder, according to a 2018 government filing.

Snyder, in the filing, requested the right to have access to documents from Blair and Comstock to gather more material to bolster his defamation suit in India against Media Entertainment Arts WorldWide.