Gregory J. Marshall (#019886)
Patrick A. Tighe (#033885)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
gmarshall@swlaw.com
ptighe@swlaw.com

Jordan W. Siev (*Admitted Pro Hac Vice*)
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 521-5400
jsiev@reedsmith.com

*Attorneys for Petitioner Daniel Snyder*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from Bruce Allen Pursuant to 28 U.S.C. § 1782 | Case No. 2:21-mc-00022-SPL<br><br>**DECLARATION OF JORDAN W. SIEV, ESQ. IN OPPOSITION TO RESPONDENT BRUCE ALLEN'S MOTION TO VACATE AND/OR TO QUASH PETITIONER'S SUBPOENAS** |

I, Jordan W. Siev, hereby declare under oath, pursuant to 28 U.S.C. § 1746:

1. I am a partner with the law firm of Reed Smith LLP, and I am counsel for petitioner Daniel Snyder ("**Snyder**" or "**Petitioner**") in this matter. I have been admitted to this Court *pro hac vice* in this matter. I am fully familiar with the facts and circumstances set forth herein and make this Declaration in support of Snyder's Opposition to Respondent Bruce Allen's ("**Allen**") Motion to Vacate and/or to Quash Petitioner's Subpoenas (the "**Motion**").

**I. Contrary to His Affidavit, Allen Has Coordinated With the Press to Spread Disparaging Narratives to Advance His Agenda**

2. In the Subpoenas, Snyder seeks documents in Allen's possession, custody and/or control from calendar year 2020 (after he was fired by the Washington Football

Team (the "**Team**")) containing information relevant to the campaign of defamation against Snyder, which included the publication of several articles falsely accusing Snyder of sex trafficking and affiliation with Jeffrey Epstein (the "**Defamatory Articles**").[1] *See generally* ECF No. 1.

3. Allen swore in his affidavit [ECF No. 8-1] that he does not have to produce relevant documents concerning the media disinformation campaign against Snyder because, among other things, during his tenure with the Team, Allen "maintained a low profile with respect to the media, rarely participating in press conferences or otherwise interfacing or speaking with reporters." *See* ECF No. 8-1 ¶ 7. Allen also swore, unequivocally, that he "***never*** served as an anonymous source for any news or media reports." *Id*. at ¶ 9 (emphasis added).

4. Allen's sworn statements are at best misleading, and more likely false. As discussed below, Allen's emails from his time with the Team (which are not the subject of the Subpoena) strongly suggest that he served as an anonymous source to football reporters. Additionally, unbeknownst to Snyder at the time, during his tenure with the Team, Allen spread negative media narratives against his enemies in the football world by spoon-feeding talking points to at least a leading conservative talk show host with millions of followers (the "**Talk Show Host**"), and to a popular then-current ESPN on-air personality (the "**ESPN Personality**").

5. These surreptitious efforts to control media spin disprove or at least cast substantial doubt on Allen's claims to have had little involvement with the media or to have never served as an anonymous source, and further establish why Allen should be required to produce the documents sought in the Subpoena.

---

1 Allen's counsel failed to meet and confer about the Subpoena with Snyder before filing the Motion. Although counsel for the parties met and conferred a week later telephonically, the session was unfruitful. Subsequent email exchanges between respective counsel for Snyder and Allen regarding a proposed ESI protocol and Snyder's offer to engage an independent forensic review vendor to conduct the searches at Snyder's sole expense have not resulted in an agreement.

A. **Allen Appears to Have Served as an Anonymous Source to Reporters**

6. Allen's affidavit is called seriously into question by numerous emails in which Allen appears to serve as an "off the record" source for reporters. By way of just a few examples:

- After a reporter asked Allen — who the reporter referred to as "***Mr. Editor***" — whether Allen knew of "anything that should be added, changed, tweaked" in connection with a draft article about a labor dispute, Allen disclosed confidential information concerning the dispute. *See* Ex. 1 (emphasis added).[2]

- After a reporter told Allen that he understood that the labor dispute was over, Allen responded that "[a]nother smart owner told me its [sic] not done." *See* Ex. 2.

- Allen forwarded a reporter a confidential email — which expressly states that it should not be shared with the media — regarding a football player's interest in being traded, which the reporter said he would use during a Sunday football show. *See* Ex. 3; *see also* Ex. 4 ("I have not heard from … since 2:30am . . . . Not done[.]).

- After a reporter asked about private inquiries made by the Team regarding a football player — stressing the sensitivity of the information by saying "[h]ope this isn't too deep into in-House only matters" — Allen provided a response noting that, in fact, there were no such inquiries about the player. Ex. 5.

---

[2] Certain exhibits to this declaration contain redactions to protect the privacy of third-parties, who are instead referred to as "football person," "reporter" or the like. Should the Court so desire, Snyder can submit unredacted versions of the exhibits to the Court, for review *in camera*. Snyder can also provide unredacted versions of the exhibits to Allen's counsel upon request after entry of a mutually agreeable protective order.

- 3 -

- After a reporter asked Allen for an update on a new hiring, adding "Won't quote you obviously," Allen replied "We will call you later to update you." *See* Ex. 6.

7. Similarly, Allen repeatedly met with media figures in private settings or scheduled one-on-one calls, which he arranged by email while taking care to leave the exact subject of discussion unspecified, suggesting that background and/or off-the-record discussions took place. *See* Exhibit 7. Allen's testimony that he never served as an anonymous source is thus misleading, and more likely false.

8. Notably, at least some reporters appear to have been equally comfortable providing confidential or unreleased information to Allen, as well. For instance, in 2014, a reporter provided information about the upcoming draft to Allen before Allen learned through official channels, and in 2015 a reporter urged Allen to call him after Allen mentioned a "trade thought", saying the reporter had "LOGS to add to that fire…." *See* Exhibits 8-9. The fact that confidential information flowed *to* Allen is further indication that he was willing to provide it in exchange.

9. Moreover, Allen's attempt to paint himself as having only limited contact with the media generally is contradicted by the evidence. In reality, Allen fielded dozens and dozens of media requests for comment over his tenure; and on many occasions Allen engaged with the media, both overtly and privately. *See, e.g.*, Exs. 10 (a calendar entry showing a series of upcoming interviews for Allen); 11 (Allen agreeing to appear on a radio show); 12 (Allen informing a reporter which neurologist cleared a specific player); 13 (Allen explaining a lawsuit to a reporter); 14 (Allen providing a reporter with details on a private and sensitive conversation between a player and coach and promising to "get more later"); 15 (Allen agreeing to be interviewed by a reporter for a profile on him); 16 (Allen agreeing to an interview with a reporter).

10. This is only a small sampling of the many times Allen engaged with reporters during his tenure at the Team.

B. **Allen Fed Disparaging Narratives about Football Personnel to the Talk Show Host**

11.  The Talk Show Host is a prominent radio talk show host and podcaster. Through the Talk Show Host's various programming, the Talk Show Host reportedly reaches millions of loyal listeners.

12.  Allen used the Talk Show Host to propagate Allen's negative views of certain football personnel, to which the Talk Show Host was highly receptive. In so doing, Allen spread his narrative to the Talk Show Host's massive following.

13.  For instance, Allen boasted that he wrote the Talk Show Host's radio segment in which one of the main points was "[Football person]. DON'T TRUST HIM." *See* Ex. 17.

14.  Similarly, years later, after Allen fed the same Talk Show Host talking points about players kneeling in protest, including how "10% of the players and owners are the issue," the Talk Show Host said that the Talk Show Host would "*hit some of this now*." *See* Ex. 18 (emphasis added). Allen thanked the Talk Show Host for doing so:

> From: Bruce Allen [Bruce.Allen@redskins.com]
> Sent: 6/5/2018 11:19:41 PM
> To: [Redacted - Talk Show Host]
> Subject: Re: Tonight
>
> Thanks.
>
> This is so ridiculous it's embarrassing
>
> On Jun 5, 2018, at 7:03 PM, [Redacted - Talk Show Host] wrote:
>
> good points, will hit some of this now
>
> -----Original Message-----
> From: Bruce Allen <Bruce.Allen@redskins.com>
> To: [Redacted - Talk Show Host]
> Sent: Tue, Jun 5, 2018 7:01 pm
> Subject: Tonight
>
> You are passionately correct (again). However, remember 90%+ of NFL players have never considered kneeling.
>
> The 10% of the players and owners are the issue (see [Redacted - Football Owners])
> I really appreciated your comments about respecting the previous players that made our leagues for today's players .... and what you are doing for future players
>
> I've used that theme for years

*See id.*(emphasis added).

15. After Allen sent the Talk Show Host negative information about a football person, Allen and the Talk Show Host agreed that the person is a "dummy." *See* Ex. 19.

16. Allen also validated the Talk Show Host's opinions of a football person. For example, Allen agreed with and gave credence to the Talk Show Host's statement that a football person "doesn't help," "talks too much" and "doesn't understand the fans." *See* Ex. 20.

17. In sum, Allen succeeded on multiple occasions in directly influencing the Talk Show Host to publish the content Allen desired.

18. Accordingly, Allen's lack of candor to the Court has backfired. Allen's practice of executing secret media campaigns — which Allen failed to disclose to the Court in his affidavit — establishes that the Motion is designed to shield from Snyder relevant information concerning any involvement Allen may have had in the media campaign executed against Snyder.

C. **Allen Provided Disparaging Narratives About a Football Person to the ESPN Personality**

19. Similar to Allen's machinations with the Talk Show Host, Allen spoon-fed the ESPN Personality disparaging narratives about football personnel and others connected to the sports world.

20. For example, Allen told the ESPN Personality that:[3]

- A football person will be replaced. *See* Ex. 22.
- Certain football personnel "can't come up with a good idea if their life depended on it." *See* Ex. 23.
- A football person's policies were "all for TV ratings." *See* Ex. 24.

---

[3] Although Allen and the ESPN Personality's emails often included other people, Allen never told the ESPN Personality that the ESPN Personality was not permitted to use or share these opinions in the ESPN Personality's capacity as an ESPN on-air personality. This is in stark contrast to other emails that Allen designated "For [the ESPN Personality's] eyes only." Ex. 21 ("Don't share with espn sl**s").

- 6 -

- A coach "shouldn't [have] take[n] the call" from a football person during which the football person suggested that the coach should "draft qu\*\*\*s."[4]  *See* Ex. 25.

21. Furthermore, Allen frequently validated the ESPN Personality's "hot takes" about football issues, including the ESPN Personality's assessment that a football person is a "clueless anti football p\*\*\*y:"



*See* Ex. 26 (emphasis added).

22. Similarly, Allen validated the ESPN Personality's position that "this f\*\*k" player should be "cut" for choosing not to stand for the national anthem to bring awareness to racial injustices:

---

[4] Throughout this declaration and in the attached exhibits, we have redacted offensive words contained in Allen's original emails.

> From: Redacted - ESPN Personality
> Sent: 8/28/2016 5:04:23 PM
> To: Bruce Allen [Bruce.Allen@redskins.com]
> Subject: Re: interesting
>
> **Good for you. The [Redacted] blows**
>
> Sent from my iPhone
>
> On Aug 28, 2016, at 12:45 PM, Bruce Allen <Bruce.Allen@redskins.com> wrote:
>
>> **I've expressed my OUTRAGE to [Redacted]**
>>
>> From: Redacted - ESPN Personality
>> Sent: Sunday, August 28, 2016 12:44 PM
>> To: Bruce Allen
>> Subject: Re: interesting
>>
>> [Redacted] **statement; it's OK if you don't stand up for the national anthem. We prefer they do but it's not mandatory. They suspend people for taking amino acids they should cut this f**k**
>>
>> Sent from my iPhone

*See* Ex. 27 (emphasis added).

23. Allen also spread disparaging narratives about other football figures to the ESPN Personality. For example, Allen told the ESPN Personality that:

- A former General Manager is a "***dolt***." *See* Ex. 28 (emphasis added).
- A football player was a "***thug***." *See* Ex. 29 (emphasis added).
- A football announcer "***sucks***" and "***is an ass***." *See* Ex. 30 (emphasis added).
- He tells a sports reporter to "***f**k himself***" every time he sees him.

*See* Ex. 31 (emphasis added).

24. The evidence thus shows that, far from being the wallflower with the media that he has told the Court he was, Allen routinely fed talking points and opinions to the ESPN Personality.

## II. The Evidence Suggests That Allen Communicated Extensively With John Moag During the Time of the Corrupt Misinformation Campaign Against Snyder and the Team

25. As has been widely reported, the Team's former minority owners hired Moag & Co. ("**Moag**") to sell their interests in the Team. It was recognized that the minority owners' stakes would sell for significantly more — and thus Moag could potentially be entitled to a larger commission — if Snyder's majority interest was also available for purchase at the same time.

Case 2:21-mc-00022-SPL   Document 14-1   Filed 06/18/21   Page 9 of 12

26. On September 17, 2020, Mr. Moag sent Snyder a text in which he told Snyder that he will disclose "the more serious shit" if Snyder doesn't agree to a "business deal", also noting that "if you want a shit show, we are on for that too:"



*See* Ex. 32.

27. After Allen's separation from the Team at the end of 2019, Allen had no business reason to remain in contact with Mr. Moag.

28. Yet Allen remained in extensive contact with Mr. Moag throughout 2020, during which time Mr. Moag was involved in threatening Mr. Snyder with the release of negative information.

29. In fact, based on my review of Mr. Moag's phone records, Allen and Mr. Moag spoke 87 times between January and November 2020, totaling over 1,200 minutes (nearly 21 hours):

- 9 -

|  | **Incoming** | **Outgoing** | **Total Calls** | **Total Call Time (minutes)** |
|---|---|---|---|---|
| January | 1 | 0 | 1 | 19 |
| April | 2 | 1 | 3 | 88 |
| May | 4 | 4 | 8 | 118 |
| June | 4 | 11 | 15 | 171 |
| July | 3 | 4 | 7 | 139 |
| August | 7 | 11 | 18 | 281 |
| September | 7 | 11 | 18 | 220 |
| October | 6 | 3 | 9 | 106 |
| November | 3 | 5 | 8 | 95 |
| **Total** | 37 | 50 | 87 | 1,237 |

30.  Moreover, based on my review of Mr. Moag's phone records, Mr. Moag often spoke with Allen in the same time frame that Mr. Moag spoke to a reporter. By way of one example, on September 26, 2020, Mr. Moag spoke to Allen within hours of speaking to a reporter:



31. The timing of Mr. Moag's calls with Allen and the press thus suggests Allen's knowledge of Moag's efforts, if not close coordination between them, to provide information to the press about Snyder or the Team.

32. But despite this extensive phone contact, in connection with a separate Section 1782 proceeding seeking discovery from Moag, only one text conversation and two emails between Mr. Moag and Allen were produced — and even then, only in partial form — all of which concerned either the Defamatory Articles or other negative publicity concerning Petitioner and the Team. While the completeness of Moag's production is the subject to a motion for spoliation sanctions in a different action, the fact that the limited documents Moag produced show that Allen communicated with Moag about the Defamatory Articles and other negative publicity concerning Snyder and the Team demonstrate why the Subpoena is proper, and why the Motion should be denied.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: New York, New York

June 18, 2021

                                          /s/ *Jordan W. Siev*
                                          **JORDAN W. SIEV**