Stephanie J. Quincy, SBN 014009
quincys@gtlaw.com
Aaron J. Lockwood, SBN 025599
lockwooda@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016
(602) 445-8000

*Attorneys for Respondent Bruce Allen*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from Bruce Allen Pursuant to 28 U.S.C. § 1782 | Case No. 2:21-mc-00022-SPL<br><br>**RESPONDENT BRUCE ALLEN'S REPLY IN SUPPORT OF HIS MOTION TO VACATE APRIL 29, 2021 EX PARTE ORDER AND QUASH SUBPOENAS OR, ALTERNATIVELY, FOR PROTECTIVE ORDER** |

**INTRODUCTION**

Apart from unfounded procedural challenges to Allen's Answer and Motion, Snyder's Opposition constitutes nothing more than a baseless, *ad hominem* attack on Allen. Snyder requested a three-week extension to respond to the Motion apparently to scour the tens of thousands of messages in Allen's old redskins.com account and, finding nothing of substance, has used irrelevant messages (some a decade old) to cast Allen in a false light. This smattering of email that Snyder has presented to the Court, offer *no* support for the allegation that Allen may have evidence for use in the Indian Action. Worse, Snyder's improper use of those irrelevant email to malign Allen publicly serves as a testament to how Snyder will use Allen's *personal* email, texts, and phone calls for reasons entirely unrelated to the Indian Action, if the Court gives Snyder what he wants.

Indeed, when counsel conferred over the Subpoenas, Snyder's counsel *expanded their scope*, by, among other things, demanding communications with individuals unrelated to the Epstein Articles—*i.e.*, Jeffrey Pash, the NFL's General Counsel, and Melanie Coburn, a former Team cheerleader who launched a petition asking the NFL to release its findings into the Team's workplace culture.[1] (Ex. 1, 5/19/21 Schoenberg email.) And, despite the inclusion of common names, such as "Bobby," "Dan," and "John," and the number "eleven," Snyder demanded *all* search results, even irrelevant and personal material, restricting Allen's counsel to a privilege review. (*Id*.) When Allen's counsel raised obvious concerns with that approach, Snyder's counsel offered no compromise or explanation as to how Allen's communications with Pash or Coburn would have anything to do with the Indian Action. (Ex. 2, 6/14/21 Schoenberg email.)

Furthermore, as the longtime controlling owner of an American professional sports franchise, Snyder is a public figure often in the news. In that role, he has received—and should expect to receive—both positive and negative publicity. Nevertheless, he speculates as to the existence of some concerted, yet ill-defined, "campaign of

---

[1] Allen does not recognize Coburn's name. Based on her public commentary, Coburn has long been an outspoken critic of Snyder. (*See* Ex. 3.)

1

defamation" against him by individuals he cannot identify, despite an army of private investigators, attorneys, and §1782 actions at his disposal. He then argues, as he has in many other §1782 actions, that this phantom "campaign" justifies far-reaching discovery into the personal lives of all those even loosely associated with the Team. This "campaign of defamation" is so malleable that Snyder has used it to seek broad discovery from his former executive assistant (Blair), the Team's former minority owners' broker (Moag), the agent of former Team players (Schaffer), the spouse of the Team's former General Manager (McCloughan), and a former Team Senior Assistant (Ferguson), among others. (*See* Doc. 8-3, Mot., Ex. C.)

Snyder has now turned his claimed "campaign of defamation" on Allen. But relevance, even when defined broadly for civil discovery, requires a *logical relationship* between the information sought and possible proof of *the claims at issue*. The burden is higher when seeking discovery from a non-party, which requires the information sought to be both relevant *and material*. Yet Snyder's Opposition continues to fail to establish any logical relationship between Allen's personal communications and the purported "campaign of defamation"—much less the specific allegations in the Indian Action. Indeed, one reading the Opposition would have no idea that the Indian Action actually arises from speculation in mid-2020 by an Indian website, MEAWW, that an article *The Washington Post* would soon publish would connect Snyder to Epstein and sex trafficking. (The *Post* made no such connection.) In fact, the Opposition not once mentions MEAWW, any other Indian Action defendant, *The Washington Post*, Epstein, or sex trafficking.

Rather, in an effort to justify the sweeping, invasive discovery from Allen, the Opposition tries to redefine the Indian Action entirely. Snyder now alleges that "Allen himself has a long history of using the public media to advance his own agenda against anyone adverse to him – *which is precisely the conduct that is at issue in the Indian Action for which Petitioner seeks discovery from Respondent herein*." (Opp. at 2 (emphasis added).) This is an objectively false characterization of the Indian Action and Allen's

2

history. This refusal to focus on the defamation *per se* claims pending in the Indian Action confirms that Snyder's Petition was never intended to discover evidence 'for use in' that action. Accordingly, this Court can—and should—vacate its prior *Ex Parte* Order and quash the Subpoenas that Snyder had served under authority of that Order. Furthermore, as explained in Allen's Motion and here, Snyder's unreasonable conduct in bringing this proceeding and needlessly expanding it warrants an award of the attorneys' fees and costs that Allen has reasonably incurred—and will continue to incur—in responding to the Petition and the Subpoenas.

## ARGUMENT

**I. Snyder's unfounded personal attacks provide no good-faith predicate to believe Allen even potentially has evidence for use in the Indian Action.**

### A. Allen's Motion to Vacate the *Ex Parte* Order Is Procedurally Proper.

Snyder mischaracterizes Allen's motion to vacate as "procedurally improper." (Opp. at 4.) But a court always "has discretion to reconsider and vacate a prior order." *Honor Plastic Ind. Co. v. Lollicup USA, Inc.*, 462 F. Supp. 2d 1122, 1134 (E.D. Cal. 2006). In §1782 actions in particular, respondents routinely file—and have granted—motions to vacate the *ex parte* orders entered before their appearances. *See, e.g.*, *Gorsoan Ltd. v. Sundlun (In re Gorsoan Ltd.)*, 20-678-cv (Lead), at *3 (2d Cir. Jan. 29, 2021) (reversing denial of motion to vacate *ex parte* order); *In re App. of Inmobiliaria Tova, S.A.*, No. 20-24981-MC-COOKE/O'SULLIVAN, at *2 (S.D. Fla. Mar. 10, 2021) (denying renewed §1782 petition after granting motion to vacate); *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 20 Misc. 209 (PAE), at *1 (S.D.N.Y. Nov. 6, 2020) (granting motion to vacate); *In re App. of Sabag*, No. 1:19-mc-00084-JPH-TAB (S.D. Ind. Aug. 18, 2020) (same); *In re App. of EWE Gasspeicher GmbH*, Civ. No. 19-mc-109-RGA, at *2 (D. Del. Mar. 17, 2020) (same); *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 178 (S.D.N.Y. 2020) (granting motion to vacate as to certain respondents).

More substantively, Snyder falsely argues that Allen made "no attempt whatsoever to identify any errors in the Court's order, or to challenge its analysis under the Section 1782 test." (Opp. at 5.) The outset of Allen's Motion states that "Mr. Snyder seeks Mr. Allen's personal information for unstated purposes here in the United States, not 'for use' by the tribunal in New Delhi." (Mot. at 2; *see also, e.g.*, *id*. at 14 ("Numerous telltale facts confirm that Snyder's §1782 Petition is not intended to discover evidence 'for use in' the Indian Action.").) Section 1782 expressly requires that the discovery sought be "for use in" the foreign proceeding. 28 U.S.C. §1782(a).

Allen's Motion also explained that, in addition to the explicit statutory requirements, §1782 applications made "in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials" render the court "free to deny the application in toto." (Mot. at 10.) Snyder's own cited cases confirm this as "an appropriate discretionary consideration, whether or not it is articulated as an *Intel* factor." *In re Republic of Ecuador*, No. C-10-80225 MISC CRB, at *13 (N.D. Cal. Feb. 22, 2011) (§1782 discovery deemed to be a "fishing expedition" or a "vehicle for harassment" should be denied). Snyder's procedural challenge to Allen's request for vacatur is unfounded.

**B.   Allen's request to quash the Subpoenas is procedurally proper.**

Snyder also erroneously challenges on procedural grounds Allen's request for an order quashing the Subpoenas. First, he asserts an alleged failure to meet and confer. (Opp. at 10.) As a threshold matter, it is unclear if LRCiv 7.2(j) applies to motions to quash subpoenas. *See, e.g.*, *Games2U, Inc. v. Game Truck Licensing, LLC*, No. MC-13-00053-PHX-GMS, at *2 (D. Ariz. Aug. 9, 2013) ("Motions to oppose subpoenas served on non-parties are not subject to the meet-and-confer obligation"); *see* this Court's standard Case Manage Order at 3 (applying LRCiv 7.2(j) only to the parties), *at* www.azd.uscourts.gov/judges/judges-orders. Nonetheless, in an abundance of caution, Allen's counsel wrote to Snyder's counsel on May 10, 2021, before filing the Motion, to discuss the impropriety of the Petition and Subpoenas. (Ex. 4.) In response, Snyder's

4

counsel stated unequivocally that "Snyder will not withdraw his Petition or the discovery requests in the subpoenas in their entirety." (Ex. 5 at 1 (enclosures omitted).) Thus, Allen knew that his request to quash could not be resolved amicably. *See, e.g.*, *Garcia v. JPMorgan Chase Bank*, No. CV-16-01023-PHX-DLR, at *8 (D. Ariz. Mar. 30, 2018) (excusing failure to complete meet-and-confer efforts because "it likely would be futile"); *O'Neal v. Las Vegas Metro. Police Dep't*, No. 2:17-cv-02765-APG-EJY, at *3 (D. Nev. Aug. 10, 2020) ("futility is recognized as an exception to the meet and confer requirement"). In addition, Rule 45(d)(2)(B) imposed on Allen a 14-day deadline after service of the Subpoenas to object to them. Given Snyder's affinity for procedural challenges, he surely would have argued that the Motion was untimely had Allen delayed its filing to continue futile negotiations.

Second, Snyder argues that Allen has failed to meet the requirements of Rule 45(d)(3)(A). (Opp. at 11-12.) But district courts have "broad discretion" to quash a subpoena, and Snyder offers an overly narrow view of the grounds on which a court may do so. *E.g.*, *Goolsby v. Raney*, 483 Fed. Appx. 326, *4 (9th Cir. 2012). Rule 45 requires quashing a subpoena that "subjects a person to an undue burden." "This undue burden category encompasses situations where the subpoena seeks information irrelevant to the case." *Singletary v. Sterling Transport Co., Inc.*, 289 F.R.D. 237, 241 (E.D. Va. 2012) (quotation marks omitted). "[A] subpoena imposes an undue burden on a party when it is overbroad." *Id*. (marks omitted); *see also Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 256 (S.D. Ohio 2011) (quashing subpoenas on relevancy and overbreadth).

Moreover, Rule 45 incorporates general discovery standards. *E.g.*, *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006). The court must balance "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Id*. "[I]f the sought-after documents are not relevant, nor calculated to lead to the discovery of admissible evidence, *then any burden*

5

*whatsoever imposed would be by definition 'undue.'" Id.* (emphasis added). These are the grounds Allen invoked, and they provide ample bases for quashing the subpoenas.[2]

### C. Snyder has never factually linked Allen to the Epstein Articles to justify the requested discovery.

Rule 26(b) permits discovery of "nonprivileged matter that is relevant to any party's claim or defense." "An item of information sought is relevant to a claim or defense if the requesting party can articulate a *logical relationship* between the information sought and possible proof or refutation *of the claim or defense at trial*." *Applying Amended Rule 26(B)(1)*, 199 F.R.D. 396, 408-09 (J.P.M.L. 2001) (emphasis added). Snyder's authorities recognize that "[t]his mere 'relevance' standard, however, does not apply to nonparties." *R. Prasad Indus. v. Flat Irons Envtl. Solutions*, No. CV-12-08261-PCT-JAT, *4 (D. Ariz. June 20, 2014); *see Laxalt v. McClatchy*, 116 F.R.D. 455, 458 (D. Nev. 1986) ("even without the protective order provisions of Rule 26(c), … [t]he standards for nonparty discovery … require a stronger showing of relevance"). Thus, "[t]o obtain discovery from a nonparty, a party must demonstrate that its need for discovery outweighs the nonparty's interest in nondisclosure." *R. Prasad Indus.*, No. CV-12-08261-PCT-JAT at *4. Said differently, Snyder must demonstrate that the information sought is relevant *and material*. *E.g.*, *Optimize Tech. Sols., LLC v. Staples, Inc.*, No. 14-MC-80095, 2014 WL 1477651, at *2 (N.D. Cal. Apr. 14, 2014).

These standards are no different under §1782. *See* 28 U.S.C. §1782(a) (unless a court orders otherwise, "the testimony or statement shall be taken, and the document or

---

[2] Snyder argues that Allen's Answer was procedurally improper. (Opp. at 4.) But none of his cited authorities support his remarkable proposition that, in a §1782 action, "no response is required or permitted." (*Id.*) Faced with strong opposition in other §1782 proceedings, such as when he sought discovery from the Comstock Holding Companies in Virginia (*see* Doc. 8-5, Mot., Ex. E), Snyder has filed a Notice of Dismissal pursuant to Rule 41(a)(1), as the respondents had served neither an answer nor a summary-judgment motion. (*See, e.g.*, Ex. 6.) Here, however, Allen has requested affirmative relief—an award of fees and costs—and does not want Snyder unilaterally non-suiting this action without a stipulation or court order because Allen never served an "answer."

6

other thing produced, in accordance with the Federal Rules of Civil Procedure"); *see Ex parte App. Varian Med. Sys. Int'l AG*, No. 16-mc-80048-MEJ, at *8 (N.D. Cal. Mar. 24, 2016) (the "proper scope of discovery arising out of a §1782 application is generally determined by the Federal Rules of Civil Procedure").

Acknowledging these standards, Snyder professes to have "overwhelming evidence and good faith grounds for his belief that Allen is in possession of relevant documents and information that will aid in Petitioner's prosecution of the Indian Action." (Opp. at 6.) Yet he fails to show it, and his protestation cannot withstand even minimal scrutiny. Snyder first argues that, as alleged in his Petition, he believes Allen possesses relevant documents because: (1) Allen was terminated from the Team in 2019; (2) Allen had extensive communications with Moag, who allegedly demonstrated advance knowledge of negative publicity concerning Snyder; and (3) the absence of any mention of Allen in *The Washington Post* articles that painted the Team and Snyder in a negative light. (Opp. at 6.) Even if true, none of these points, alone or in combination, suggests that Allen has *any* information related to the defamation claims arising from the Epstein Articles at issue in the Indian Action. The three points add up to zero.

First, there is *no* evidence, or even allegation, that Allen has ever sought *any* retribution against Snyder. To the contrary, Allen continued to maintain a low profile since his time with the Team. (As the Motion explains, it is in fact Snyder who has repeatedly demonstrated animus toward Allen.) Second, nothing in Allen's communications with his long-time friend, Moag, reflects *advance* knowledge of *any* negative articles about Snyder or the Team—much less advance knowledge of the Epstein Articles. Both the Petition and Opposition assert, without support, that Moag had "advance knowledge" of *The Washington Post*'s July 2020 article critical of Snyder. (Petition at 2; Opp. at 6.) Even if true, such knowledge would reflect nothing nefarious. Many reporters and public figures anticipated that article and publicly speculated as to its content. (*See, e.g.*, Ex. 7, "Reporters hint at big story on fired Washington Redskins executives" (posted July 14, 2020, citing tweet from July 12); Ex. 8, "There's a

7

Washington football bombshell coming and it's not about the name" (posted July 15, 2020); Ex. 9, "Washington source denies rumor of team paying off referees" (posted July 16, 2020, noting "Speculation has been running the past few days about a potentially damaging story related to Washington's NFL team").) In any event, Allen had no advance knowledge, and Snyder merely speculates that he did.

Third, the negative publicity about which Snyder complains does not mention Allen *because he was not involved in the underlying events*. As Allen's Motion states, those events (including Snyder's alleged misconduct toward a female employee on a private jet) occurred *before* Allen was with the Team, and he was most certainly not present on the jet. (Mot. at 8-9.) This fact should leave one to wonder why Allen would be mentioned in those articles, rather than to conclude, as Snyder does, that Allen must have served as an anonymous source. Moreover, the Team employed hundreds, if not thousands, of people during Allen's tenure—many of whom (because of their positions with the Team) had access to the media but who were also *not* mentioned in the *Post* articles. By Snyder's rationale, he should be able to seek sweeping discovery from all those individuals in aid of the Indian Action's prosecution. But §1782 simply was never intended for such boundless inquiry. *See, e.g.*, *In re Republic of Ecuador*, No. C-10-80225 MISC CRB at *13 (courts should reject a §1782 "fishing expedition"); *In re O2CNI Co.*, No. C 13-80125 CRB (LB), at *20 (N.D. Cal. Oct. 29, 2013) (§1782 does not sanction "a fishing expedition" or "harassment"). Allen was not mentioned because he was irrelevant.

Snyder's efforts in his Opposition to buttress his Petition fare even worse. He accuses Allen of having a "pattern and practice of making derogatory and false claims concerning Petitioner and the Washington Football Team … in order to distract from his own egregious misconduct." (Opp. at 2.) Yet Snyder fails to establish a single false claim, much less a "pattern and practice." Nor does he identify any "egregious misconduct" from which Allen is supposedly trying to distract attention (or, for that matter, how either the alleged "pattern and practice" or "egregious misconduct" connects Allen to the Epstein Articles). What Snyder does offer is a couple dozen email from Allen's old Team email

account. The paucity of email submitted to this Court itself refutes any such "pattern and practice." (*See, e.g.*, Doc 15-4 at 2, Siev Decl., Ex. 3 (Allen responding "[e]very couple years" to a reporter's comment that sharing was "unlike you").)

Those email demonstrate the desperate grasping at straws Snyder must make here. In fact, the cited email relate to a few recurring topics—about which Allen would have been hard pressed to avoid *any* media contact—mostly with the same individuals, including: (a) the player lockout in 2011 and players' association's lawsuit against the league in 2012 in connection with negotiations over a new collective bargaining agreement; (b) the hiring of Jay Gruden as the Team's coach in 2014; (c) the Team's name-change controversy; (d) the players' national anthem kneeling protests; (e) Allen's efforts to acquire a new Team stadium; and (f) various individual player contracts, trades, or medical issues. Not one of these email makes false claims about Snyder or the Team. *Not one is even about Snyder.* To the contrary, the email reflect Allen's consistent defense of the Team and the League. Moreover, the potentially inflammatory (and irrelevant) language that Snyder misleading emphasizes to accuse Allen of being "derogatory" comes from the other parties on those exchanges—not Allen. The Court should not countenance Snyder's attempt to use that irrelevant correspondence to obfuscate what the Indian Action is actually about and otherwise to malign Allen.[3]

Snyder's only other evidence in support of his Petition is a single text message from Moag to Snyder. (Doc. 15-33, Siev Decl., Ex. 32.) This message is a red herring.

---

[3] To date, Snyder has refused to provide Allen with an unredacted copy of these email (to which Allen no longer has access). Despite Allen's repeated requests, Snyder has failed to provide any basis for withholding this evidence. (*See* Ex. 10.) Instead, on June 30, 2021, Snyder filed a "supplement" to his counsel's declaration that simply unredacted personally identifying information of non-parties. (Doc. 19.) This is *not* what Allen had requested, as Allen *agreed* with Snyder's redaction of the publicly filed copy. Accordingly, not only is Snyder wasting the Court's and Allen's time (and money) with these email, he has now purposely revealed the names of people who have *zero* connection to the Epstein allegation and whom the Opposition casts in a disparaging light. It is difficult to understand why Snyder would choose to expose others to harm when there was no need to do so.

9

Moag sent it *after* Snyder filed a §1782 action against him purportedly in aid of the Indian Action, which, of course, was after MEAWW published the Epstein Articles. (*Cf.*, Doc. 15-1 at 9, Siev Decl. ¶ 26, *with* Mot., Ex. C.) Allen was not even a party to that exchange. In short, Snyder has failed to show a good-faith factual predicate to seek discovery from Allen for use in the Indian Action, and he should not have been granted §1782 authority to issue the Subpoenas.

## II.  Even if Snyder had met basic §1782 requirements, the Subpoenas are vastly overbroad, and a Protective Order is warranted.

The Subpoenas seek everything of Allen's since January 1, 2020 relating to "Petitioner, the Team and the [alleged] campaign of negative publicity concerning both." (Opp. at 4.) Snyder claims entitlement to any evidence that might lead him to the identities of "third parties involved in directing, coordinating with, or supporting *any* negative information campaign about Petitioner." (Opp. at 8 (emphasis added).) But, evidence about *any* negative publicity about Petitioner or the Team—if Allen has any—goes far beyond anything remotely related to the Indian Action.

Snyder also complains that, although Allen has made clear that he has thousands of emails, Allen has not yet run the broad searches Snyder believes are justified and, therefore, Allen has failed to show undue burden. (Opp. at 13.) But this is precisely the kind of undertaking that Allen should not have to endure without a threshold showing of relevance. *See, e.g.*, *ATS Prods., Inc. v. Ghiorso*, No. 11-mc-109-WEB, at *4 (D. Kan. June 17, 2011) ("the court will not require Spirit, a non-party, to search all of its records and databases for document requests that are overly broad"). Likewise, Snyder cannot bootstrap an argument that Allen has no "legitimate" privacy interest in his personal email, texts, and phone calls merely because Snyder has accused him of being part of a "scheme to spread false claims." (Opp. at 15.) If mere accusations sufficed, no one's records would ever warrant privacy protection.

In any event, Snyder does not oppose Allen's request to strictly limit Snyder's use of responsive information to the prosecution of the Indian Action. (Mot. at 17.) Therefore,

10

to the extent limited discovery from Allen is permitted, any protective order entered in this matter should so provide.

### III. This unfounded proceeding and its abusive, overbroad requests justify an award of reasonable attorneys' fees and costs.

Section 1782 and the Federal Rules each obligate Snyder to avoid seeking third-party discovery in the absence of a good-faith basis and, further, to take reasonable steps to avoid imposing undue burden and expense. When those duties are breached, federal statutes, the Federal Rules, and the Court's inherent authority all permit an award of reasonable attorneys' fees and costs. As detailed above, Snyder has failed to comport with those duties in this proceeding and such an award is warranted.

### CONCLUSION

For the foregoing reasons, Allen respectfully requests that the Court vacate the *Ex Parte* Order and quash Snyder's Subpoenas, or, at a minimum, enter a Protective Order narrowly tailoring the Subpoenas to the issue raised by the Indian Action. Allen also requests an award of his fees and costs incurred here.

Dated this this 2nd day of July 2021.

        GREENBERG TRAURIG, LLP

        By: */s/ Stephanie J. Quincy*
            Stephanie J. Quincy, SBN 014009
            Aaron J. Lockwood, SBN 025599
        *Attorneys for Respondent Bruce Allen*

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory J. Marshall
Patrick A. Tighe
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
gmarshall@swlaw.com
ptighe@swlaw.com

Jordan W. Siev
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022
jsiev@reedsmith.com

*Attorneys for Petitioner Daniel Snyder*

By: */s/ Diane J. Linn*
Employee, Greenberg Traurig, LLP